FILED
2015 May-07  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

# PART 2

58

**IN THE CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA**

CIRCUIT COURT CLK
FILED IN OFFICE
MORGAN COUNTY ALABAMA
2007 APR -9   AM 9:40

STATE OF ALABAMA,               )
                                )
       Plaintiff,               )       **CASE NO.   CC 2006-988**
                                )
v.                              )
                                )
LYLE DAN MONTGOMERY,            )
                                )
       Defendant.               )

## STATE'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS INDICTMENT OR IN ALTERNATIVE MOTION FOR
## MORE DEFINITE STATEMENT

Comes now the State of Alabama, by and through its Attorney General, and does hereby respond to Defendant's above designated motions:

1.  The indictment in the above-styled cause is not vague or ambiguous and it does not violate any of Defendant's constitutional rights.

2.  Rule 13, *Alabama Rules of Criminal Procedure*, governs criminal charges in this State. The State has complied fully with the provisions of Rule 13.

3.  The indictment is sufficient to inform the Defendant with reasonable certainty of the nature of the accusation made against him, and contains that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment, as required under the rules and laws of the State of Alabama.

4.  The State has further complied with the standard in Alabama that an indictment is sufficient if it follows the language of the statute violated,

 

provided the statute prescribes with definiteness the constituents of the offense. *Ex parte Allred*, 393 So.2d 1030, 1032 (Ala.1981).

5.    The State has followed the rule in Alabama that indictments are a statement of legal conclusion, rather than of facts. It is not required that an indictment plead evidentiary facts necessary for a conviction. *Hochman v. State*, 91 So.2d 500, 501 (Ala.1956).

6.    The indictment alleges that the offense occurred between January 1984 and December 1984. The Defendant has sufficient information regarding the date of the offense. The date and time of the offense are not material elements for which the State is obligated to plead in the indictment.

7.    The Defendant has failed to show good cause to necessitate the granting of a motion for a more definite statement as required by Rule 13.2(e), *Alabama Rules of Criminal Procedure*. Therefore, his motion should be denied.

                    Respectfully submitted,

                    TROY KING
                    ATTORNEY GENERAL
                    BY:

                    STEPHANIE C. BILLINGSLEA (BIL004)
                    ASSISTANT ATTORNEY GENERAL



## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the above on Thomas M. Di Giulian, Attorney for Lyle Dan Montgomery, 422 E. Moulton Street, P. O. Box 1373, Decatur, Alabama 35602-1373, by placing a copy of the same in the United States Mail properly addressed and with postage prepaid.

DONE this the 4th day of April, 2007.

STEPHANIE C. BILLINGSLEA (BIL004)
ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Attorney General
Public Corruption and White-Collar Crime Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130-0152
Phone: (334) 242-7300
FAX:  (334) 242-4890

From: 334-353-8400   To: 812565606076    Page: 1/5      Date: 3/7/08 2:45:50 PM



**STATE OF ALABAMA**
**OFFICE OF THE ATTORNEY GENERAL**

TROY KING
ATTORNEY GENERAL

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, AL 36130
(334) 242-7300
WWW.AGO.STATE.AL.US

General Civil Litigation; Consumer Affairs; Criminal Trials
Facsimile Cover Sheet
Fax #: (334) 242-2433
Telephone #: (334) 242-7555 (Civil)
(334) 242-7335 (Consumer)
(334) 242-7407 (Criminal)

Date: _March 7, 2008_

To: _Judge Paler_

Fax #: _256-560-6076_

From: _Mary McKenna_

# of Pages (including cover) _5_

Subject: _State v. Lyle Montgomery_

Comments: _Courtesy Copy_

## Confidentiality Notice

The information contained in this facsimile message, or the documents attached hereto, is confidential information intended only for the use of the individual(s) or entity named above. If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited. If you receive this communication in error, please notify us by calling 1-800-392-5658 (within Alabama), or the telephone number above, and return the original message to this office at the address provided via the U.S. Mail. Thank you for your cooperation.

IN THE CIRCUIT COURT FOR MORGAN COUNTY, ALABAMA

STATE OF ALABAMA ............................... )
                               )
vs.                              )      **CASE NO. CC 06-988**
                               )             CC 06-987
LYLE DANIEL MONTGOMERY,      )
                               )
DEFENDANT.                    )

## REPLY TO STATE'S OPPOSITION TO DEFENDANT'S MOTION TO CONTINUE AND MOTION FOR ORDER

Comes now the Defendant, Lyle Daniel Montgomery, and for reply to State's opposition to the Defendant's Motion to Continue says as follows:

1.      Correct.

2.      Defendant doesn't know why the case was not set until April, but it was not. This case was set for trial on June 25, 2007. The State of Alabama requested a continuance of that trial setting, the defendant did not object, and the trial was continued. The reason given by the State in its motion to continue was that the State had another case set for trial that week here in Morgan County. Apparently, having one other trial set the same week is good enough reason for the State to request a continuance, but the extensive trial schedule of the undersigned is not a sufficient reason to continue the trial of this case..

3.      This Court has been assigned the trial of the *State of Alabama vs. Patrick Napoleon Smith*, which is set for May 19, 2008, and while the case has been scheduled for well over a month, the Court is well aware that it takes significant time to prepare for the trial of a capital murder case.

This Court has been advised that the Patrick Napoleon Smith case will take

anywhere from seven (7) to ten (10) trial days and the Defendant is sure the Court is aware, that preparation for a capital murder trial is exhaustive and extensive and requires the complete and total attention of the trial attorneys for at least three weeks prior to the trial of the capital case, to the exclusion of other matters, and requires significant preparation for several months in advance of the trial.

The trial in Cullman County between Joseph Clark and Jamie Lawrence in all likelihood, if it is tried, will be tried on April 7, 2008. One of the Plaintiffs in the case, Joseph Clark, has been diagnosed with mantel cell lymphoma and is not expected to survive more than two months. As a result, the undersigned has extended discovery in that case for the purposes of taking the deposition of Joseph Clark for perpetuation of his testimony in the event that he succumbs to his illness. In the event that Joseph Clark succumbs to his illness prior to the trial, it is likely that the Clark trial would be continued but the undersigned cannot rely on that and must prepare for the trial of that case as well as the four divorce cases, one of which is settled which he also has set for the week of April 7, 2008. The undersigned has other cases set through the month of March.

4. As I read the indictments in the instant case, which was returned on October 5, 2006, the Attorney General's use of the word "multiple" in defining the victims in the indictment in this case, is somewhat of an overstatement. There is one victim in each case, neither of which is any longer a child. One of the indictments in these cases, alleges instances that occurred between January 1, 1995, and December 31, 1995, about eleven years prior to the indictment in the case.

---

State of Alabama vs. Lyle Daniel Montgomery; Morgan County Circuit Court No. CC06-988 & CC06-987; Reply to State's Opposition to Defendant's Motion to Continue and Motion for Order

(2 of 5)

The other indictment in these cases alleges conduct which occurred during the calender year of 1984. It is hard to understand how if it took 11 and 22 years to get indictments in these two cases, that an additional continuance would somehow prejudice the victims.

5.     One of the continuances of the trial of this case was at the request of the Attorney General, and was filed by him on May 24, 2007, to which continuance the Defendant agreed. Apparently when the Attorney General needs a continuance because it has **ONE** case set for trial that week, that is a good reason and will work no hardship on the alleged victims, but not so if the request for a continuance is on behalf of the Defendnat. It is hard to conceive how a continuance at the request of the State is alright but a continuance at the request of the Defendant will result in "mental anguish associated with preparing oneself for a trial against the individual accused of sexually abusing and sodomizing you". (Emphasis added, quote from the State's objection).

6.     With regard to paragraph 6., of the State's response, again, passage of time between the date of the alleged offense and the indictment is substantial and it is, again, hard to understand how waiting 11 and 22 years to indict is any more significant than a continuance of a few months.

8.     In addition, on March 8, 2007, the Defendant filed a Motion for Return of Property. On approximately December 3, 2007, the undersigned spoke with the Assistant Attorney General assigned to this case and discussed the return of the Defendant's

State of Alabama vs. Lyle Daniel Montgomery; Morgan County Circuit Court No. CC06-988 &
CC06-987; Reply to State's Opposition to Defendant's Motion to Continue and Motion for Order

(3 of 5)

State of Alabama
Office of the Attorney General
Investigation Division

Nº 1180

**RECEIPT FOR PROPERTY**

MATTER # A6-99047-001

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED

☒ OWNER ☐ OTHER LYLE DAN MONTGOMERY

ADDRESS 401 14TH ST SE DECATUR AL 9/1/2006

LOCATION WHERE PROPERTY WAS OBTAINED 401 14TH ST APT 3A DECATUR, AL

TIME 130 ☒ AM ☐ PM

| ITEM NO. | QUANTITY | DESCRIPTION OF PROPERTY - (include model, serial number, identifying marks, condition, and value when appropriate.) |
|---|---|---|
| 10 | 1 | .38 CAL. REVOLVER |
| 11 | 1 | .22 CAL RIFLE |
| 12 | 1 | 12 GAUGE SHOTGUN |
| 13 | | $729.50 CURRENCY + COIN |
| | | 3 - $100 BILLS |
| | | 15 - $20 BILLS |
| | | 10 - $10 ROLLS OF QUARTERS |
| | | 4 - $5 ROLLS OF DIMES |
| | | 3 - $2 ROLLS OF NICKELS |
| | | 7 - $.50 ROLL OF PENNIES |
| | | END |

VALUABLE / DANGEROUS PROPERTY
HELD FOR SAFEKEEPING

NAME OF AGENT MAINTAINING CUSTODY
N. CHRIS MCPEAK

SIGNATURE

**CHAIN OF CUSTODY**

| ITEM NO. | DATE | RELINQUISHED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY (INCLUDE LAB CASE #) |
|---|---|---|---|---|
| 10 | 9/1/06 | McPAK | SAMBOR | SAFEKEEPING IN MONTGOMERY |
| 11 | | McPAK | SAMBOR | SAFEKEEPING IN MONTGOMERY |
| 12 | | McPAK | SAMBOR | SAFEKEEPING IN MONTGOMERY |
| 13 | 9/1/06 | McPAK | SAMBOR | SAFEKEEPING IN MONTGOMERY |

EXHIBIT A

(White - Original) • (Yellow - Owner) • (Pink - Agent) • (Gold - Other)

141

MATT PROTER
HSV- 837-8882

## OFFICE OF ATTORNEY GENERAL

### INVESTIGATION DIVISION

### CONSENT TO SEARCH

1. I have been asked by Special Agents of the Alabama Attorney General's Office to permit a complete search of:
(Describe the person(s), place(s), or thing(s) to be searched.)

① FORD VAN, ALA. LIC PLATE
52C580W

② FORD F150 TRUCK, ALA. LIC PLATE 47B7A86
BOTH PARKED AT APT 13A, 401 14TH ST SE,
DECATOR, AL

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation.

9/11-2006
Date

Signature

Witness

3



OFFICE OF ATTORNEY GENERAL

INVESTIGATION DIVISION

## CONSENT TO SEARCH

1. I have been asked by Special Agents of the Alabama Attorney General's Office
   to permit a complete search of:
   (Describe the person(s), place(s), or thing(s) to be searched.)

   APT 13A, 401 19TH SE, DECATUR, AL
   AND ALL CONTENTS THEREIN.

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related
   to their investigation.

9/1/2006
Date

Signature

Witness



## ALABAMA ATTORNEY GENERAL'S OFFICE
### INVESTIGATIVE DIVISION
### INVESTIGATIVE REPORT FORM

**October 24, 2006**
**TRANSCRIPTION DATE**

**NAME:**      Lyle Dan Montgomery
**ADDRESS:**    401 14th Street, SE
              Decatur, AL.
**TELEPHONE:**  N/A

Montgomery provided the following information after being advised of my official identity and after being advised of the nature of the Attorney General's investigation. The interview took place at the Morgan County Jail and I was assisted by Decatur Police Sergeant Terry White.

I reviewed for accuracy the following transcript of Martell's interview on January 4, 2007. The initials CM, TW, and LM appearing in the transcript identify the speaker as Chris McRae, Terry White and Lyle Montgomery, respectively.

### TRANSCRIPT

CM:    The recorder is on. This is Chris McRae with the Alabama Attorney General's Office. I'm at the Morgan County Jail with Sergeant Terry White from the Decatur Police Department and we are getting ready to speak to Mr. Dan Montgomery about the crime he is charged with which is Sodomy in the 1st Degree. Sergeant White would you introduce yourself just so the secretary can recognize your voice?

TW:    Sergeant Terry White Decatur Police Department, Special Victims Unit.

CM:    Mr. Montgomery would state your name?

LM:    Yes. My name is Lyle Daniel Montgomery.

CM:    Alright thank you. The time is... first of all the date is September 1, 2006, the time is approximately ten minutes after nine o'clock, a.m. Again, we are in the Morgan

---

**DATE OF INTERVIEW** _September 1, 2006_ **AT** _Morgan County Jail, AL_

**BY** _Chris McRae_              **SPECIAL AGENT(S).**

**FILE #** _99047-001_



#5

noc#195373

**Page 2**

File # 99047-001

County Jail in Decatur, AL. Before we ask any questions Mr. Montgomery I am going to again advise you of your rights. I advised you of your rights at the scene, is that correct?

LM: That's correct.

CM: Ok, and you signed right's waiver form... no I just advised you of your rights so you didn't sign any form I don't believe at that time.

LM: I think I was going to sign one and you had the wrong form. I think.

CM: But you did sign two consent to search forms, correct?

LM: Yes.

CM: Consent to search your home or your residence, Apartment A ,14th Street... 401 14th Street Southeast, Decatur, AL.....

LM: That's correct.

CM: ...And, to search two vehicles parked in your driveway...your personally owned van and a red Ford F-150 pickup truck that is your work truck that's assigned to you to drive home.

LM: That's correct.

CM: Thanks. Before we ask any questions about the matter we are going to discuss this morning, I am going to advise you of your rights again and I'm going to tell you again as I told on the scene that you are charged with 1st Degree Sodomy.

LM: Ok. What does that mean?

CM: It means that you had deviate sexual intercourse with a child under twelve when you were over sixteen. And we will get into it in further detail if you want to talk to us. Before I ask you any questions I want to tell you that you have the right to remain silent do you understand that?

LM: Yes, sir.

CM: Anything that you say can be used against you in court. Do you understand that?

LM: Yes, sir.

CM: You have the right to consult with an attorney before I ask you any questions and to have an attorney present during questioning. Do you understand that?
LM: Yes, sir.

**Page 3**

CM:  If you desire to consult with an attorney prior to questioning and or have an attorney present during questioning but cannot afford to retain one, one will be provided for you before we question you.  Do you understand that?

LM:  Yes, sir.

CM:  If you decide to answer questions now, with or without an attorney, you have the right to stop answering the questions at any time.  Do you understand that?

LM:  Yes, sir.

CM:  Ok.  Do you want to talk to us?

LM:  I would like to find out what's going on yes, sir.  First, may I ask how Bobby is?

CM:  Bobby is fine his...Bobby Garret, for the record, is who were talking about, correct?

LM:  No, Bobby Thorn.

CM:  Bobby Thorn, I'm sorry.  He is fine.  Jerry his brother... half brother... is there with him; his mother is there with him...

LM:  Ok. Good.

CM:  As is her husband, what is his name ,Eddie Kirby?

LM:  I don't know him,. Kirby.

CM:  Yeah, Kirby.

LM:  Doc Kirby's son?

CM:  Yeah.  The three of them were there when I left.

LM:  Ok.

CM:  So he is being well taken care of,

LM:  Ok.

CM:  So you do want to go ahead and we will proceed with the interview?

LM:  Yeah, I would like to start and kind of see what's going on?
CM:  Ok.



**Page 4**                                                                                                    File # 99047-001

LM:   Then I reserve the right to call a lawyer if it sounds very, very serious.

CM:   Absolutely it its.  What education level do you have?

LM:   High School.

CM:   Do you read and write?

LM:   Yes.

CM:   Ok.  Would you read back this waiver of rights form and read it out loud please?

LM:   I don't have my reading glasses.  I understand the nature of the investigation I
      understand my rights I affirm that no threats or promises have been made to me
      and I affirm that I have been "cosured".

CM:   ...Coerced.

LM:   Coerced or pressured into making a statement.  I agree to be interviewed without an
      attorney being present at this time.

CM:   Ok.  Is that correct?

LM:   That is correct.

CM:   Alright, would you print your name on the top line right here.  Please put the date
      which is September 1, there and the time which is... It is now, we'll call it 9:15 am
      and then sign under there.  Thank you, and I need to sign it.  Sergeant White.

      Ok, Mr. Montgomery I'm going tell you a little bit about me because I want you to
      understand where I'm coming from and I'm going to add some context.  I have been
      on the job a while.  I'm fairly blunt and fairly straight forward, I'm not going to play
      games with you, I don't want you to play games with me.  If you want to stop talking,
      stop talking anytime.  But, the only thing that will anger me or get me riled-up is if
      you tell me something that's not true.  I'd rather you just tell me you don't want to
      talk about it.  Ok.  Some of the questions that Sergeant White and I are going to ask
      you and talk about we already know the answers to.  We didn't fall off the truck last
      night you know and we have done a good bit of the investigation.  Some of the
      questions that we are going to ask you we don't know the answer to.  You are not
      going to know which ones are which, but if we sense that you know that you are
      being less than candid with us that will tick me off.  I don't know how it will affect
      Sergeant White.  It will not tick me off at any point if you just say hey, time out I
      don't want to talk anymore or I don't want to answer that question and we will move
      on to the next question.  It will not offend me the least bit.  So I just want to lay that
      on the table.  So that we understand each other on that.

**Page 5**                                                          File # 99047-001

LM:  Yes, sir.

CM:  Ok.  To get to the point I received... the Attorney General's Office received a complaint about two weeks ago that you had sexually abused your former step grandson, B███ G████...you know B███ I suppose?

LM:  Yes.

CM:  Ok.  I'm aware that you are generally... that you know that B███ talked to his parents about that complaint, is that correct?

LM:  No.

CM:  Ok.  So Jerry Garrett hasn't talked to you about it?

LM:  No.

CM:  Ok.

LM:  I did not, have not ever molested in any way form or fashion, B███

CM:  When we start investigating that allegation that led to other people who, both in and outside the Garrett family...your former family, that alleged that you had not only molested them but sodomized them.  Do you know the definition of sodomy?

LM:  Is that anal?

CM:  No it's not... it can be, but it's also oral sex.

LM:  Oh, ok.

CM:  It's... legally the lawyers call it deviate sexual intercourse but it's a number of different acts.  Anal sex is one and oral sex is another.  These victims alleged that the acts occurred when they were young boys.  Generally speaking, we will get into some specifics in a little bit.  They were under the age of twelve when it happened...some as young as six.  The one that I would like to start with is S███ G████  Do you know B███ S████ n G█

LM:  Oh yeah, he is my middle stepson.

CM:  Ok.  When did he become your stepson?

LM:  '84.  His mother and I married in '84.

CM:  Ok.  How long were you married to his mother?

**Page 6**

File # 99047-001

LM:   Thirteen years.

CM:   Alright, so that would have been about 1997 that you divorced?

LM:   '97 or '98. I have trouble remembering the exact date without looking it up. B████
      was... I would have to look it up to be for sure, it's in that general area.

CM:   Ok. When did you meet S█████? Did you meet him before you married his
      mother?

LM:   Yeah, I think probably a couple of years before we married. It was after my dad
      passed away. He passed away in '90. I know I didn't know him before then. It was
      sometime after then. Not '90,...'80.

CM:   Ok. Alright, where did you meet him?

LM:   To tell you the truth, I don't know exactly, I'm not sure if it was the skate rink or if it
      was at someone's house.

CM:   Ok. You were working at the skating rink in those days... during... as far back as
      1980?

LM:   Yeah.

CM:   When did you actually start working there?

LM:   '74.

CM:   Ok. You do what? What was you're...

LM:   ...work on the floor and assistant manager.

CM:   Ok, when you say work on the floor...

LM:   Yeah, floor.

CM:   ...supervise the skaters?

LM:   Yeah.

CM:   Ok, and you do that part time?

LM:   Yeah.

CM:   What's your full time job?

**Page 7**                                                    File # 99047-001

LM:   QORE.  It's an engineering firm.

CM:   Ok, and that's spelled for the record.

LM:   Q-O-R-E.

CM:   Ok.

LM:   Weird name.

CM:   Is that located...where?

LM:   I work out of the Huntsville office.

CM:   Ok.

LM:   They have a Decatur office also.

CM:   Alright.  What do you do there?

LM:   I'm, I guess, a construction inspector...would be the easiest term.  I am an engineering technician.

CM:   Alright.  Getting back to the skating rink and leading into S▓▓▓▓, you could have met him at the skating rink or you would have met him at somebody's house?

LM:   Yeah we... his mom and I had a mutual friend...

CM:   Ok.

LM:   ...Not really for sure if the first time I saw him if it was at the rink or at someone else's house or where I don't know.  But, it was through his momma.

CM:   Ok, so you knew his mom first?

LM:   Yeah.

CM:   Were you dating her at the time or were you just acquaintances?

LM:   Well, I'm not sure when we went from acquaintance to dating.

CM:   Ok, where were you living at that time?

LM:   At that time I was still living at home.

CM:   Which was where?

**Page 8**

File # 99047-001

LM:  ████ Miller Street.

CM:  ████ Miller Street?

LM:  Yeah.

CM:  Alright, and how would you describe the nature of your relationship with S████ prior to him becoming your stepson?

LM:  We got along OK ... got along better with J████

CM:  Ok, that's J████ his older brother?

LM:  Yes.

CM:  Ok. When you say you got along did you visit, did you do social activities together, or did you just see him at the skating rink?

LM:  We did social activities together later on.

CM:  What type of social activities?

LM:  Skating I guess. I don't really remember.

CM:  Ok. How about like cave crawling?

LM:  Oh yeah.

CM:  Ok. How about shooting fire works in the parking lots of stores.

LM:  Yeah.

CM:  Ok. Go to movies?

LM:  Yeah, long time ago.

CM:  Go swimming?

LM:  Yeah, we used go off and on, of course the whole family would go.

CM:  Go skinny dipping?

✱ LM:  I think maybe, I might should talk to a lawyer.  *de Annke    Concern ??*

CM:  On that question or...?

**Page 9**                                                    File # 99047-001

LM:   No, just in general.

CM:   So you want a lawyer right now?

LM:   Yeah. I am going to try to find one. I don't know many lawyers.

CM:   Ok.

LM:   Cause it look like it going to go... I just need some advice.

CM:   Alright. That's your right and we respect it and you know you just have to do what
you need to do on finding one I can't recommend one even if I knew one.

LM:   Yeah the only one I know is Tom Digiulian. He helped me on the guardianship for
B

CM:   Alright the time... we are going to terminate the interview.

TW:   Can I say one thing before you turn that off?

CM:   Sure, yeah, absolutely.

TW:   Let me ask you a question and I just want you to think on this and I am going to give
you some definitions. I don't want you to answer any of my questions, ok? You
have asked for an attorney.

LM:   Ok.

TW:   When Chris was telling you about sexual deviate... you have sex... sexual deviate
manner or whatever when he said... what in your mind does that in entail?

LM:   Sex, touching, anything.

TW:   Well a lot of people may say deviate....

LM:   It's a child....

TW:   ... they got this little deviate thing. Not necessarily as he was saying deviate sexual
intercourse can be oral or anal. In other words by definition, state definition if I am
performing cunnilingus, do you know that means?

LM:   Uh um.

TW:   If I am having oral sex with my wife, I am performing oral sex on my wife that
lawfully she was not my wife they would consider that deviant. Do you understand

**Page 10**                                                      File # 99047-001

what I'm saying?

LM:  Oh, ok.

TW:  So I don't want you to... a lot of people misunderstand that term and get this wild thing going through their head that they think I'm this big deviant guy. I do a lot of things that under the law if it wasn't with my wife they would consider. It's just a way to describe it.

LM:  Oh, ok.

TW:  Ok, so some of things that you know if my wife were to give me oral sex if she was not my wife that would be considered deviant or that would be considered deviant sexual intercourse, you understand what I'm saying?

LM:  Oh, ok.

TW:  So it's not necessarily a deviant act that 99.9 % of the people have not done themselves.

LM:  Oh, ok.

TW:  Ok.  I want you to understand that and that later you should look it up and understand that when were talking about... I'm not talking about doing a dog or anything like that. I am talking about normal things with unmarried people. Ok. So don't let that word freak you out. If you sit around and decide that you want to talk to me or Chris and say hey look I've got some things I need to talk to you about. I have found that in like cases like this right here the chances are something very, very similar has happened maybe to you and I think we are wanting to give you an opportunity.

CM:  Yeah there's two sides to every story.

TW:  That people need to understand where you are coming from and if you decide that want to do that. I'm not telling you that you need to; I'm not telling you don't need to. But I'm telling you know as much as anybody else what happened with all of these people. Do you understand what I'm saying?

LM:  Uh-huh.

TW:  And if you want your story to be told we are here for you. Got any questions?

LM:  No, sir.

CM:  This is my card, and Sergeant White is leaving his contact information.

**Page 11**                                          File # 99047-001

LM:   Ok.

CM:   I'm physically based in Madison so I don't come up from Montgomery I'm right here in this area.

LM:   Ok.

CM:   Of course, Sergeant White is as well.  After you talk with your attorney if yall want to sit down and discuss this that's fine.  If you don't, you know, we are just going to plug along with the investigation and go ahead and follow leads were they take us.

LM:   Ok.

CM:   Nothing personal we just...

LM:   You're just doing your job and I understand that.

CM:   Anything else?

TW:   No, sir.

CM:   Ok.  I am going to terminate the interview and the time now is... we will call it twenty five minutes after nine.

LM:   Ok.

CM:   Thank you Mr. Montgomery.

### SEVENTEEN MINUTES, 56 SECONDS

CM:adf

proves his guilt.   You must be convinced of the Defendant's guilt after full, fair, and impartial consideration of all the evidence before you can return a verdict of guilty.

In determining any issue of fact presented in this case, you should be governed solely by the evidence presented.   You should not indulge in speculation, conjectures, or inferences not supported by the evidence.

The Defendant's guilt must be proven beyond a reasonable doubt, and each member of the jury must be satisfied of such.   To clarify the term "reasonable doubt," it may help you for me to explain that the doubt which would  justify an acquittal must be an actual doubt, not merely a guess or a surmise.  It should not be a mere vague, conjectural, or speculative doubt, but a reasonable, actual doubt arising from the evidence and remaining after a careful consideration of all the evidence.  It is a doubt that reasonable and fair-minded

2

men and women would entertain consciously and would entertain under all the circumstances.  Note that the State is not required to convince you of the Defendant's guilt beyond all doubt -- but simply beyond reasonable doubt. Beyond a reasonable doubt does not mean to an absolute, unqualified, positive certainty.  Everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. A reasonable doubt may arise from the evidence, or it may arise from a lack of evidence or the insufficiency of evidence.  A reasonable doubt is one for which a good reason can be given.  Another way to say that is: I believe    the    Defendant    is    guilty    because _____.  (And be able to give a good reason for why you believe it.)

As judge, I am not permitted to express my opinion or comment upon the evidence presented to you or the credibility of any witness.  Therefore, any rulings,

3

```
1   A.    No, sir.

2             MR. BEARDEN:  I have absolutely

3         nothing further for you.  Thank you for

4         your testimony.

5             MR. DI GIULIAN:  Nothing further.

6             THE COURT:  Thank you, sir.  You

7         may stand down.

8             Call your next witness.

9             MRS. COKER:  State calls Blake

10        Garrett.

11            THE COURT:  You're still under

12        oath.  You took the oath earlier.  Have

13        a seat.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  Your witness.

16            J█████ B███ █ G████████,

17            a witness for the State,

18        was sworn and testified as follows:

19                 DIRECT EXAMINATION

20   BY MRS. COKER:

21   Q.    Good morning, Mr. Garrett.  How are you

22        doing?

23   A.    Doing pretty good.

24   Q.    My name is Tina Coker and I'm a

25        prosecutor for the State.
```

369

| 1 | A. | Okay. |
|---|----|-------|

1     A.    Okay.

2     Q.    We haven't met before, have we?

3     A.    No.

4     Q.    Have we ever discussed this case

5           before?

6     A.    No.

7     Q.    Okay.  You've been sitting in the

8           courtroom this morning?

9     A.    Yes, ma'am.

10    Q.    And you know generally why we're all

11          here?

12    A.    Yes, ma'am.

13    Q.    All right.  I'm going to ask you a few

14          questions.  Okay?

15    A.    Okay.

16    Q.    And if you can't hear me or if you

17          don't understand anything, please just

18          stop me and say I don't know what

19          you're talking about or say it a little

20          louder or anything that I can do to

21          help you understand what I need you to

22          say to the jury, please feel free to do

23          that.  Okay?

24    A.    Yes, ma'am.

25    Q.    All right.  Tell me your full name.

| | | |
|---|---|---|
| 1 | A. | J█████ B███ G████████ |
| 2 | Q. | And when were you born? |
| 3 | A. | ████████████████. |
| 4 | Q. | And how old are you now? |
| 5 | A. | Nineteen years old. |
| 6 | Q. | It's August.  So are you in school? |
| 7 | A. | We start August 20th.  I just ended |
| 8 | | with summer classes about a week and a |
| 9 | | half ago. |
| 10 | Q. | And where is "we start"? |
| 11 | A. | The University of North Alabama in |
| 12 | | Florence. |
| 13 | Q. | And you just graduated high school this |
| 14 | | year? |
| 15 | A. | I graduated in 2007. |
| 16 | Q. | 2007.  Tell me about what you've been |
| 17 | | doing since you got out of high |
| 18 | | school. |
| 19 | A. | My major in college now is biology |
| 20 | | pre-med.  So trying to make it in that |
| 21 | | school.  I have a 4.0, on the Dean's |
| 22 | | list.  I'm really involved.  I was |
| 23 | | president of my freshman class at UNA. |
| 24 | | So that's what I've been up to is |
| 25 | | mostly school. |

```
1    Q.   You're in the public eye at UNA then?

2    A.   Yes, ma'am.

3    Q.   They know who you are?

4    A.   Yes, ma'am.

5    Q.   Tell me about where you grew up.  Your

6         parents are divorced; is that correct?

7    A.   Yes, ma'am.

8    Q.   When did they divorce as far as how old

9         were you when they divorced if you can

10        remember?

11   A.   I don't remember.  Probably two.

12   Q.   You were very little?

13   A.   Very little.

14   Q.   All right.  Since your parents divorced

15        have you ever lived in the household

16        with your dad, Jerry?

17   A.   Never lived, no, ma'am.

18   Q.   So you were raised with your mother?

19   A.   Yes, ma'am.

20   Q.   Did she ever remarry?

21   A.   Yes, ma'am.

22   Q.   How many times?

23   A.   Once.

24            MR. DI GIULIAN:  Judge, I don't

25        know that -- I mean, she can stay
```

```
 1              remarried.  I don't know how many times
 2              she was remarried.  It's all irrelevant
 3              and immaterial.
 4                   MRS. COKER:  I'm just laying a
 5              background for who he is, Your Honor,
 6              and what his family situation is.
 7              That's all.
 8                   THE COURT:  I'll sustain the
 9              objection.
10    Q.   (BY MRS. COKER:)  Is she remarried now?
11    A.   Yes, ma'am.
12    Q.   How long has she been remarried?
13    A.   For about -- I think they just had
14         their 16th or 17th anniversary maybe.
15    Q.   And who is she remarried to?
16    A.   Darrell Lynn Morgan.  That's my dad.  I
17         call him my dad.
18    Q.   Your dad?
19    A.   Yes, ma'am.
20    Q.   Does he live in the household with you?
21    A.   Yes, ma'am.
22    Q.   And he's done so pretty much your whole
23         life?
24    A.   My whole life.
25    Q.   Growing up were you able to have a
```

```
 1              relationship with your biological
 2              father?
 3    A.        I was able to but we really didn't see
 4              each other that much.
 5    Q.        Were you -- did you know how to contact
 6              him?  Did you have visitation with him?
 7    A.        Yes, ma'am.
 8    Q.        I have to get you not to nod.  That's
 9              the one thing so the court reporter
10              next to you can type down what you
11              say.
12    A.        Sorry.
13    Q.        Did you have regular visitation with
14              him growing up?
15    A.        Not regular but we visited a good bit I
16              would say when I was littler.
17    Q.        When you were smaller?
18    A.        Yes, ma'am.
19    Q.        Did you ever spend any time in his
20              household at all visitationwise?
21    A.        Yes, ma'am.
22    Q.        Ever spend any holidays or anything
23              like that with your biological father?
24    A.        Some of them, yes.
25    Q.        Your standard divorce papers?
```

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | Right now the reason we're here today |
| 3 | | is about some events that occurred in |
| 4 | | the summer of '95, and I'm going to |
| 5 | | direct your attention to that summer if |
| 6 | | that's all right. |
| 7 | A. | Okay. |
| 8 | Q. | There were some events that occurred |
| 9 | | during the summer of 1985 at |
| 10 | | Mr. Montgomery's house that you have |
| 11 | | talked about with law enforcement |
| 12 | | before; is that correct? |
| 13 | | MR. DI GIULIAN:  Judge, we object |
| 14 | | to the question.  She's laid an improper |
| 15 | | date.  She said '85.  It's '95 is the |
| 16 | | allegation. |
| 17 | Q. | (BY MRS. COKER:)  I'm sorry.  '95. |
| 18 | | I'll rephrase.  We'll start over if |
| 19 | | that's all right, B█████ |
| 20 | A. | That's fine. |
| 21 | Q. | Did you ever have an opportunity to |
| 22 | | spend time with Danny Montgomery in |
| 23 | | 1995? |
| 24 | A. | From what I recall I'm pretty sure that |
| 25 | | was the year maybe I spent time with |

1          him, yes, ma'am.

2     Q.    Who is Danny Montgomery to you?

3     A.    Paw Paw Danny.  That's what I always

4           called him.  My granddad.

5     Q.    He's your granddad?

6     A.    Uh-huh.

7     Q.    And he was married to your grandmother

8           during '95; is that correct?

9     A.    From what I can recall, yes.  I'm

10          pretty sure.

11    Q.    Is that how you met him, being your

12          grandfather?

13    A.    Yes, ma'am.

14    Q.    To this day do you consider him your

15          grandfather?

16    A.    Yes, ma'am.

17    Q.    Did you ever spend time growing up at

18          your grandmother and grandfather's

19          house?

20    A.    Yes.

21    Q.    Was that an unusual thing for you to do

22          growing up?

23    A.    No.

24    Q.    Now, before we get into the events of

25          what occurred in 1995, I'm going to ask

```
 1              you about some things that happened two
 2              summers ago in 2006.  All right?
 3    A.   Okay.
 4    Q.   In 2006 did you have an opportunity to
 5              talk to some people about what might
 6              have happened to you while you were at
 7              your grandfather's house when you were
 8              young?
 9    A.   I talked to my dad.
10    Q.   And prior to talking to your father did
11              you ever tell anyone -- friends, anyone
12              in the community -- about improper
13              activities that occurred at your
14              grandfather's house when you were
15              young?
16    A.   I told dad and Chris McRae I did, but
17              I'm saying on the stand now that I did
18              not.
19    Q.   I'm going to get you to walk with me
20              slowly.
21    A.   Okay.
22    Q.   Because I want to make sure you're
23              listening to what I'm asking.
24    A.   Yes, ma'am.
25    Q.   Right now I'm not talking about Chris
```

```
 1            McRae.
 2    A.    Okay.
 3    Q.    Did you ever tell anyone, one of your
 4          friends possibly from a church group,
 5          that something improper had happened
 6          between you and your grandfather?
 7    A.    No, ma'am.
 8    Q.    Did you ever tell any friends at all
 9          about anything that occurred sexually
10          with your grandfather?
11    A.    No, ma'am.
12    Q.    That never happened?
13    A.    No.
14    Q.    All right.  B██████, you did come forward
15          and speak to your father in 2006 about
16          your grandfather?
17    A.    Yes, ma'am.
18    Q.    At that time did you tell your
19          grandfather -- your father that you had
20          been molested by your grandfather?
21    A.    Yes, ma'am.
22    Q.    At that time did you tell your father
23          that Danny Montgomery had molested you
24          approximately when you were six years
25          old?
```

```
 1    A.   Yes, ma'am.

 2    Q.   If you could, please, just tell the

 3         jury what you told your father had

 4         happened to you.

 5    A.   Okay.  Where do I start?

 6    Q.   You came forward and you spoke to your

 7         father about things that had happened

 8         on a night with Mr. Montgomery; is that

 9         correct?

10    A.   I didn't come forward and tell him.

11         That's not the story.

12    Q.   I'm going to try to make this as easy

13         possible on both of us.  All right?

14    A.   Yes, ma'am.

15    Q.   At some point you told your father

16         about something that happened with you

17         and Mr. Montgomery one night.  A couple

18         years ago you told your father about

19         something that happened with

20         Mr. Montgomery one night.

21    A.   He helped me out.  Yes, I did.

22    Q.   And at some point you ended up talking

23         to Mr. McRae about the things that you

24         had talked to your father about?

25    A.   Yes, ma'am.
```

1    Q.    Do you remember giving a statement to

2          Mr. McRae concerning this incident?

3    A.    Yes, I did.

4    Q.    Were you informed as to who Mr. McRae

5          was at the time you gave him that

6          statement?

7    A.    Yes, ma'am.

8    Q.    And you knew that he was instigating a

9          criminal investigation at that point?

10   A.    Yes, ma'am.

11   Q.    And you were clear as to the fact that

12         he was a law enforcement officer?

13   A.    Yes, ma'am.

14   Q.    And you met with him on August the 16th

15         of 2006; isn't that correct?

16   A.    Yes, ma'am.

17   Q.    About 4:30 in the afternoon at Point

18         Valley Park; is that right?

19   A.    Yes, ma'am.

20   Q.    And at that time you were able to speak

21         to Mr. McRae about the occurrences that

22         you had previously told your father

23         about?

24   A.    Yes, ma'am.

25   Q.    Now, at that time, B████ if you would,

```
 1              could you tell us the things that you
 2              said occurred between you and
 3              Mr. Montgomery that you told
 4              Mr. McRae.  I know you said that at
 5              this point you're going to say those
 6              things never happened, but if you can
 7              tell us exactly what you told Mr. McRae
 8              please do so.
 9    A.        Okay.  I'll tell you that I don't
10              really recall everything that I totally
11              said but I can tell you in a nutshell
12              exactly what I said.  That day that I
13              spoke to Chris McRae I told him that I
14              had one summer night at Danny -- at Paw
15              Paw Danny and my Maw Maw's house I had
16              gotten really scared, and I was
17              upstairs in the right bedroom and that
18              was my dad's old room.  And Maw Maw
19              never really let us stay up there, but
20              that night I got to stay up there.  And
21              I remember I was very scared and I had
22              woke up, and what I told Chris McRae is
23              I had woke up and Danny was standing
24              over me touching me on my crotch.  And
25              I ran down the stairs and was crying to
```

```
 1              grandmother telling her I saw a ghost.

 2              And as soon as that happened she was

 3              just comforting me and then called mom

 4              and I went home.

 5       Q.     These are the things that you told

 6              Mr. McRae?

 7       A.     Yes, ma'am, that's exactly right.

 8       Q.     August 2006?

 9       A.     Yes, ma'am.

10       Q.     All right.  So at that time you told

11              him your background, the same as the

12              way you did with us this morning?

13       A.     Yes, ma'am.

14       Q.     And Mr. McRae asked you about you

15              talking to your father about it

16              occurring; is that correct?  Do you

17              remember that?

18       A.     Yes, ma'am.

19       Q.     And at that time you told him that you

20              told your father and your stepmother

21              about this; is that correct?

22       A.     Yes, ma'am.

23       Q.     Your sister was present as well?

24       A.     Yes, ma'am.

25       Q.     Did you tell your father and your
```

1          stepmother and your sister about this

2          occurrence with all of them together

3          prior to talking to Mr. McRae?

4     A.   They were all in the room, yes, ma'am.

5     Q.   So that's true?

6     A.   That's true.

7               MR. DI GIULIAN:  Judge, object the

8          to characterization that's true.

9               THE COURT:  I'll sustain.  It's

10         unnecessary.  It's for the jury to

11         determine.

12    Q.   (BY MRS. COKER:)  Then you told

13         Mr. McRae that you mostly kept this to

14         yourself; is that correct?

15    A.   Yes.

16    Q.   Then you told Mr. McRae that you had

17         mentioned it to four of my friends

18         before when I was really upset and we

19         all prayed together; isn't that

20         correct?

21    A.   Yes, I said that.  Yes, ma'am.

22    Q.   And you told Mr. McRae that that was

23         about the same time you told your mom;

24         isn't that correct?

25    A.   Yes, ma'am.

| | | |
|---|---|---|
| 1 | Q. | You told Mr. McRae, "We were having |
| 2 | | troubles in our family. Nobody knew |
| 3 | | that about me and I felt comfortable |
| 4 | | enough to say it"; isn't that correct? |
| 5 | A. | Yes, ma'am. |
| 6 | Q. | If you need a moment at any time let me |
| 7 | | know. |
| 8 | A. | I'm fine. |
| 9 | Q. | And then Mr. McRae asked you, "What led |
| 10 | | you to report it?" And you said you |
| 11 | | felt like your parents had the right to |
| 12 | | know; isn't that correct? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | And you told Mr. McRae that people in |
| 15 | | the past had mentioned to you that |
| 16 | | Danny was gay or homosexual and it |
| 17 | | brought up really -- |
| 18 | | MR. DI GIULIAN: Objection. It's |
| 19 | | hearsay and an attempt to get in bad |
| 20 | | conduct, bad character of the |
| 21 | | Defendant. |
| 22 | | MRS. COKER: That's not my intent, |
| 23 | | Your Honor. |
| 24 | | MR. DI GIULIAN: It doesn't matter |
| 25 | | what her intent is. That's what it |

```
 1              does.

 2                   THE COURT:  Come here just a

 3              minute.

 4                        (Whereupon, a side bar

 5                        conference was had out of the

 6                        hearing of the jury and the

 7                        court reporter.)

 8                   MR. DI GIULIAN:  I ask that it be

 9              stricken.

10                   THE COURT:  I'll ask the jury to

11              disregard the last question.

12    Q.        (BY MRS. COKER:)  All right.  B

13              then you continued to just talk about

14              your relationship with Danny and your

15              family.  Do you remember that?

16    A.        Yes, ma'am.

17    Q.        All right.  And then Mr. McRae asked

18              you, "Moving on to the molestation,

19              what happened?"  Do you remember that?

20    A.        Yes, ma'am.

21    Q.        And do you remember telling Mr. McRae

22              about the night that the molestation

23              happened and the things that you and

24              your sister were doing?

25    A.        My sister and I?
```

1       Q.      Uh-huh.  Just the occurrences earlier

2               in that night.  Do you remember telling

3               Mr. McRae in detail about what that

4               night was like?

5       A.      (Whereupon, witness nods head

6               affirmatively.)

7       Q.      Do you remember what you said?

8       A.      Not really, no, ma'am.

9       Q.      Is there anything that would help you

10              to remember what you said?  If you saw

11              a copy of your statement from that

12              night, would that help you remember the

13              things thát you said that night?

14      A.      Yes, ma'am, a good bit.

15                      MR. DI GIULIAN:  Judge, I would

16              like to be provided with a copy of the

17              statement if they're going to use it to

18              refresh his recollection.

19                      MRS. COKER:  It's refreshing his

20              recollection, Your Honor.

21                      MR. DI GIULIAN:  I'm still entitled

22              to look at it.

23                      MRS. COKER:  That's what I'm doing,

24              Your Honor.  Be State's Exhibit 7, it's

25              one page of the statement for a

386

```
 1              refreshing recollection purpose that has

 2              been provided to the Defense previously.

 3                   MR. DI GIULIAN:  Judge, if he can

 4              identify it he can use it to refresh his

 5              recollection, but if he can't we would

 6              object to it.

 7       Q.    (BY MRS. COKER:)  Okay.  B███, I'm

 8              showing you what's been marked as

 9              State's Exhibit 7.  This is a page from

10              the interview transcript of when you

11              spoke to Mr. McRae.

12       A.    Yes, ma'am.

13       Q.    I want to give you a second to just

14              take a look at that and see if you

15              remember the conversation you had with

16              Mr. McRae and the answers you gave

17              him.  Feel free to take that and read

18              it.

19       A.    Okay.  Yes, ma'am, I remember saying

20              those things.

21       Q.    The day Mr. McRae questioned you about

22              the incident he asked you about the

23              things that you might have been doing

24              earlier in the evening if you remember?

25       A.    He did.
```

1   Q.   What were the things that you said you

2        and your sister had been doing?

3   A.   It was a normal night at our house.

4        W███████ and I we loved Achy Breaky

5        Heart, and we would always dance to it

6        with Maw Maw.  We would always just

7        play around, but that was -- that's

8        what I said, the Achy Breaky Heart

9        thing, that's what we were doing.  It

10       was just a normal night there and we

11       were having fun.

12  Q.   And you said at some point you awoke

13       and Danny was standing over me; is that

14       correct?

15  A.   I did say that, yes, ma'am.

16  Q.   And, if you could, tell us the things

17       that you said occurred at that time.

18  A.   I said that he was standing over me and

19       he touched me and he told me it would

20       be okay.  Obviously I just read that's

21       what I said.  And to -- I'm refreshing

22       my memory.  I'm sorry.  He kept telling

23       me everything would be okay.  Then he

24       left.  And then I went and got Whitney

25       and we went back downstairs, and I got

```
 1              Maw Maw at the time and told her to
 2              call Mama.  And W████████ and I were
 3              scared because I thought I had seen a
 4              ghost because I didn't know what was
 5              happening.  That's what I told my
 6              grandmother, and that's what I told
 7              Chris McRae.
 8        Q.    And then later on Mr. McRae continued
 9              to ask you about what occurred after
10              that, and he asked you about directly
11              was it skin on skin touch or was he
12              touching through your briefs.  Do you
13              know what you said?
14        A.    No, ma'am, I don't.
15        Q.    Would anything help you remember?
16        A.    That would.
17                   MRS. COKER:  Same thing.  State's
18              Exhibit 8, which is page nine of the
19              transcript of the statement.
20        Q.    (BY MRS. COKER:)  If you could take a
21              look at that for me, B████████
22        A.    Yes, ma'am.
23        Q.    He asked that night when he touched you
24              was it skin on skin or was he touching
25              through your briefs.  How did you
```

```
 1           respond?
 2    A.     I told him that it was skin on skin.
 3    Q.     Was he using his hand?
 4    A.     I said, uh-huh.  So, yes.
 5    Q.     And he asked when he touched you he
 6           touched your penis, and again did you
 7           respond affirmatively?
 8    A.     Yes, ma'am.
 9    Q.     And is it your recollection that at the
10           time you spoke to Mr. McRae that you
11           told him these things?
12    A.     Yes, ma'am.
13    Q.     And that you told him that
14           Mr. Montgomery -- that you woke up and
15           Mr. Montgomery was standing over you;
16           is that correct?
17    A.     Yes, ma'am.
18    Q.     That your underwear was down?
19    A.     Yes, ma'am.
20    Q.     And that he was touching you, skin on
21           skin touching your penis?
22    A.     Yes, ma'am.
23    Q.     And that's the story that you told your
24           father?
25    A.     That's the story we gathered together
```

```
 1               so I could talk to --
 2    Q.    And that's the statement you gave to
 3          law enforcement?
 4    A.    Yes, ma'am.
 5    Q.    And you understood that law enforcement
 6          would be seeking a criminal
 7          investigation into these charges?
 8    A.    I did not really understand that, no.
 9          I was not informed by my dad as to what
10          was happening.  But I should have been
11          mature enough to know that, yes,
12          ma'am.  I probably was.
13    Q.    And he continued to talk to you that
14          day.  He gave you some contact
15          information where you would be able to
16          get in touch with him?
17    A.    Yes, ma'am.  He gave me his card.
18    Q.    And he told you you probably wouldn't
19          hear from him anytime soon because it
20          would take some time to investigate
21          this; is that right?
22    A.    Yes, ma'am.
23    Q.    And at that time do you remember
24          telling him anything about it hurting
25          you that this could happen to you and
```

1          you didn't want it to happen to another

2          child?

3    A.    Yes, ma'am.

4    Q.    And you said that you would really like

5          to help out with anyone else that might

6          be in this situation or something along

7          those lines?

8    A.    Yes, ma'am.

9    Q.    B████, do you remember saying, "Once

10         you do it you have a tendency to do it

11         again."

12   A.    Yes, ma'am.

13   Q.    And do you remember the last thing that

14         you told Mr. McRae?

15   A.    Not really, no.

16   Q.    If I were to submit to you that you

17         said, "Just thank you so much."  Does

18         that sound out of line from something

19         you might have said at the end of this

20         interview?

21   A.    No, it doesn't.

22   Q.    Now, B████, do you currently have a

23         relationship with your grandmother?

24   A.    Yes, ma'am.

25   Q.    Have you had a relationship with your

```
 1              grandmother in the past ten years while

 2              you were growing up?

 3      A.      No.

 4      Q.      After this occurrence with

 5              Mr. Montgomery in 1995, did you

 6              continue to spend time at your

 7              grandparents' house?

 8      A.      Not that I can recall.  I don't

 9              remember.

10      Q.      Was there ever an occurrence where you

11              felt uncomfortable about being bathed

12              by Mr. Montgomery or being alone with

13              Mr. Montgomery after that time that you

14              might have spoken to Mr. McRae about?

15      A.      Not that I can recall, but if I had

16              said something.

17      Q.      And so tell us about if you can recall

18              did you ever spend the night at

19              Mr. Montgomery's house again?

20      A.      Probably so.

21      Q.      Okay.  And at what point did that

22              relationship end as far as you spending

23              time at his house?

24      A.      Probably when my mom and dad -- I mean,

25              in '95 they were already divorced.  So
```

```
 1                    obviously I was spending time over
 2                    there while they were divorced because
 3                    I know my mom was working.  I don't
 4                    know.
 5         Q.    That's fine.
 6         A.    I don't know.  I was trying to think.
 7         Q.    That's a perfectly normal answer.
 8         A.    Okay.
 9         Q.    But you continued to have a
10               relationship with your grandmother, is
11               that true, to some level?
12         A.    To some level, yes, ma'am.
13         Q.    And you still had contact with your
14               grandmother the last five years?
15         A.    Yes, I've had contact with her.
16         Q.    Do you love your grandmother?
17         A.    Yes, ma'am.
18         Q.    When this -- when you gave this
19               statement to Mr. McRae, did you have
20               any indication that your grandmother
21               might end up being arrested?
22         A.    No.
23         Q.    And for the last couple of years you've
24               continued to cooperate with the
25               investigation in this case; isn't that
```

```
 1              true?
 2      A.      There was nothing really ever said
 3              about it again.  So I just -- yeah, I
 4              didn't until I went to Danny's
 5              investigator and talked to him.
 6      Q.      Until you spoke to Mr. Montgomery's
 7              investigator?
 8      A.      Walt.
 9      Q.      Is he in here?
10      A.      No.  He's outside.
11      Q.      Someone that works for Mr. Montgomery?
12      A.      Yes, ma'am.
13      Q.      When did you speak with him?
14      A.      It wasn't long after when I had said
15              this.  I don't remember the exact date
16              or the exact time frame, but it wasn't
17              long after I had talked to Chris McRae.
18      Q.      Okay.  And then the State started
19              trying to get in touch with you the
20              past couple of weeks to get ready for
21              trial to serve you with a subpoena.
22              Are you aware of that?
23      A.      Yes, ma'am.
24      Q.      And did anyone try to contact you in
25              order to facilitate getting you served
```

| | | |
|---|---|---|
| 1 | | with that subpoena? |
| 2 | A. | Yes. |
| 3 | Q. | Who was that? |
| 4 | A. | Wendy my stepmother, my dad Jerry |
| 5 | | Garrett, and Chris McRae. I think |
| 6 | | that's it. |
| 7 | Q. | Did Mr. McRae leave you any messages or |
| 8 | | try to get in touch with you so he |
| 9 | | could give you the court information? |
| 10 | A. | Yes. |
| 11 | Q. | And did you return those phone calls? |
| 12 | A. | I did not return most of them if I did |
| 13 | | return any. I probably returned one, |
| 14 | | and I know I met with them the day to |
| 15 | | get it. |
| 16 | Q. | And did you ever give any indication to |
| 17 | | the State that the items that we've |
| 18 | | discussed from this statement that you |
| 19 | | gave Mr. McRae two years ago, that |
| 20 | | there was anything incorrect in that |
| 21 | | statement? |
| 22 | A. | No, ma'am. I just kept it to myself. |
| 23 | Q. | And we didn't have the opportunity to |
| 24 | | speak with you before trial as far as |
| 25 | | getting you ready for this hearing this |

| | | |
|---|---|---|
| 1 | | weekend, did we? |
| 2 | A. | No, ma'am. |
| 3 | Q. | So we've been walking all around it, |
| 4 | | B███, and I'm just going to be |
| 5 | | straightforward with you. |
| 6 | A. | Uh-huh. |
| 7 | Q. | We've discussed the fact that you came |
| 8 | | forward and told your father about this |
| 9 | | abuse. |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | And the fact that you came forward and |
| 12 | | told Mr. McRae about this abuse. |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | And the fact that this was a law |
| 15 | | enforcement investigation.  Tell us |
| 16 | | what happened that night in 1995 with |
| 17 | | Mr. Montgomery in front of this jury |
| 18 | | not talking about what you said |
| 19 | | before. |
| 20 | A. | Okay. |
| 21 | Q. | Tell this jury what happened that |
| 22 | | night. |
| 23 | A. | Okay.  Exactly that night what |
| 24 | | happened, I swear on everything, there |
| 25 | | was a night I was really scared and |

1          there was a night I slept up in that

2          room.  And the only thing that

3          happened, total honesty, is I was

4          scared, thought I saw a ghost, ran down

5          to grandmother.  I called my mom

6          because I probably hadn't seen her in a

7          few days because she had a full-time

8          job, and I wanted to go home.  So I

9          went home.  That's what happened that

10         night.  Nothing other than that

11         happened.

12    Q.   That's all that happened that night?

13    A.   Yes, ma'am.

14    Q.   B████ you've been sitting here

15         listening to the testimony today.

16    A.   Yes, ma'am.

17    Q.   And you heard the testimony about the

18         fact that S████ Ga████ was asleep

19         and awoke to find Mr. Montgomery

20         abusing him?

21    A.   Yes, ma'am.

22    Q.   And your allegations that you gave to

23         law enforcement originally were that

24         you were asleep and you awoke to find

25         Mr. Montgomery abusing you?

```
 1    A.    Yes, ma'am.

 2    Q.    But today before this jury you say it

 3          didn't happen?

 4    A.    Yes, ma'am.

 5    Q.    You also told law enforcement during

 6          this statement that you were scared of

 7          Mr. Montgomery after this incident;

 8          isn't that correct?

 9    A.    I said that, yes, ma'am.

10    Q.    "I just remember being scared of him

11          and telling mama."  But if you were

12          scared of a ghost, that wouldn't make

13          you scared of your grandaddy from that

14          day on, would it?

15    A.    No, ma'am.

16    Q.    But you were scared of your grandaddy

17          from that day on; isn't that true?

18    A.    Not necessarily.  I said that.  It

19          wasn't true.

20    Q.    And after that date you actually

21          requested many times to make sure that

22          your grandmother was there where you

23          wouldn't be alone with Mr. Montgomery;

24          isn't that true?  And you didn't want

25          Mr. Montgomery bathing you after this
```

1       night you saw the ghost?

2    A.    I honestly don't remember him bathing

3          me before.  I remember the only time

4          that my grandmother or Danny or anybody

5          bathed me was when I got into poison

6          ivy, and I know my grandmother gave me

7          an oatmeal bath.  But other than that,

8          I don't remember anybody bathing me.

9          But I could have said that.

10   Q.    And when she was going to give you that

11         oatmeal bath do you remember Danny

12         being there and you screamed because

13         you didn't want him to be involved in

14         that bath; isn't that true?

15   A.    I did say that.

16   Q.    That Mr. Montgomery was the one that

17         was going to help you when you had

18         poison ivy and you didn't want him in

19         there helping you; isn't that true?

20   A.    Yes, I said that.  Yes, ma'am.

21              MRS. COKER:   If I could have just

22         a moment, Your Honor.

23                   (Brief pause.)

24   Q.    (BY MRS. COKER:)   I've got just a

25         couple of questions.

```
 1     A.    Okay.

 2     Q.    In the two years since this incident

 3           occurred with Mr. McRae, since giving

 4           this statement to Mr. McRae.

 5     A.    Yes, ma'am.

 6     Q.    I again want to clarify that you never

 7           came forward and spoke to anyone from

 8           the prosecution to say none of this

 9           ever happened?

10     A.    I did not speak to anyone from the

11           prosecution, no, ma'am.

12     Q.    But today you're telling us that none

13           of this ever happened?

14     A.    Yes, ma'am.

15     Q.    I know it's dangerous sometimes to ask

16           a question you don't know the answer

17           to, but I'm going to ask a question

18           that everyone in this room is asking.

19           That's why in the world would you two

20           years ago after saying that you had

21           broken down and cried with friends,

22           after sitting down at your kitchen

23           table with your father and your mother

24           and your sister and telling them that

25           you had been abused, telling Mr. McRae,
```

```
 1              leading to the arrest of people that
 2              abuse children.
 3    A.    Yes, ma'am.
 4    Q.    What would lead you to make up such a
 5          story?  Is there anything that you can
 6          explain to this jury in any way that
 7          can explain why you would say the
 8          things in the statement to Mr. McRae
 9          and then sit here in front of us today
10          and say none of it ever happened?  I
11          completely and totally made it up.
12    A.    Yes, ma'am, I can explain.
13    Q.    Okay.  Give it a shot.
14              MR. DI GIULIAN:  Judge, objection
15          to the that comment.
16              THE COURT:  Overruled.  Go ahead.
17          Please do.
18    A.    I don't remember when this happened for
19          my dad, but I know August 2006 is when
20          W█████ and I -- I've never really had
21          a relationship with my dad that much
22          and didn't really talk to him.  He
23          started calling us over to his house
24          and, fine, we go over there and things
25          had started up about -- he would start
```

```
1          asking me questions such as have you
2          ever been scared at Danny's house
3          before.  Have you ever -- has anything
4          ever happened there before that you
5          want to tell me about?  And I was like,
6          no, no.  And after several times of
7          visiting there he had first told me
8          that there were cases that little boys
9          have come to and he told me that
10         S[       ] -- he had known a while ago
11         about S[       ]  And he had told me he
12         said, B[    ], think really hard about
13         anything that could have happened.  And
14         I said, yes, sir.  And so I thought
15         really, really hard and I remembered
16         that night I was scared.  I really do.
17         And he kept asking me, Are you sure
18         Danny wasn't over you, are you sure
19         this and are you sure that and just
20         continued to talk to me about it.  And
21         I actually entertained the idea that
22         that might have happened, that could
23         have happened to me.
24             First of all, I want to apologize
25         because I know, I know some of this
```

1    stuff is my fault.  I know it is.  I

2    blame myself a lot for it every day,

3    and I never, I never, never, never

4    should have went along with that and

5    made up the story that I did because I

6    know my Paw Paw Danny never did

7    anything to me, and no one has

8    persuaded me to say that, nothing.

9        After I had told Chris McRae that,

10   I went and I prayed really hard for a

11   couple of weeks, and it was like a

12   light blinked on my head.  I was like,

13   why did I do that.  And, y'all, I

14   cannot go through with it.  I cannot

15   sit up here on the stand and say no

16   matter if I had lied to law enforcement

17   or talked to my dad about it and he

18   helped me out and I talked to my

19   stepmother outside and we got the whole

20   story straight, no matter if that

21   happened, I couldn't do it.  I couldn't

22   stand up here and lie.  And so I wanted

23   to tell the honest truth and that's

24   what I'm doing today, unlike what I did

25   with Chris McRae and made that

```
 1              statement.
 2    Q.    Bi███, this morning you've been
 3          spending time with Mr. Montgomery and
 4          with members of his team today; is that
 5          correct?
 6    A.    Yes, ma'am.
 7    Q.    And you still have a good relationship
 8          with your mother, Chief Garrett's
 9          ex-wife?
10    A.    Yes, ma'am.
11    Q.    And with your grandmother?
12    A.    Yes, ma'am.
13    Q.    Mrs. Janet, Danny's ex-wife?
14    A.    Yes, ma'am.
15    Q.    And you know that since you made these
16          what you now say are false allegations
17          against Mr. Montgomery that several
18          more people have come forward and made
19          the same type of allegations against
20          him?
21    A.    I didn't know that for a fact, no,
22          ma'am.  My dad always told me before he
23          had even talked about a whole story
24          that he had known about S███████h a while
25          back ago and he had known about some
```

405

```
 1              things.  Then we had gathered a story
 2              together, and I had actually thought it
 3              could happen.  I thought it might could
 4              have happened.
 5    Q.        And today after hearing Mr. S
 6              G         testimony you still don't
 7              think it could have happened?
 8    A.        No, ma'am.  I don't know what happened
 9              to S        .  I have no idea but I know
10              what happened to me.
11    Q.        So it didn't happen to you?
12    A.        No, ma'am.
13                  MRS. COKER:  It didn't happen.
14                  I have no further questions for
15              this witness at this time, Your Honor.
16                  THE COURT:  Okay.  We will break
17              for lunch.  We'll start back at 1:30.
18              If you'll gather in the jury lounge at
19              1:30 I'll send for you when everybody is
20              ready.  Enjoy your lunch.  Remember the
21              instructions I've given you earlier.
22
23                      (Whereupon, at 12:06 p.m., the
24                       proceedings in the above-
25                       entitled matter was recessed,
```

406

```
 1                        to reconvene at 1:30 p.m.,
 2                        this same day.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                    AFTERNOON SESSION
 3                       (1:30 p.m.)
 4
 5
 6              THE COURT:  I hope you enjoyed your
 7         lunch.  We're ready to start back.  I
 8         believe it's cross-examination to
 9         Mr. Di Giulian.
10              MR. DI GIULIAN:  Thank you, Judge.
11                   CROSS-EXAMINATION
12    BY MR. DI GIULIAN:
13    Q.   B    , I just have a couple of quick
14         questions I want to ask you to kind of
15         flesh out a few things that you said on
16         direct.
17    A.   Yes, sir.
18    Q.   And maybe a couple of things, address
19         some things that were said by some
20         other witnesses.  You're at UNA now;
21         correct?
22    A.   Yes, sir.
23    Q.   And about how often over the last
24         couple of years have you seen your dad?
25    A.   Not much that I can recall at the
```

408

```
 1            time.  I mean, if I do see him I never
 2            spent the night at his house or
 3            anything.  But I -- we recently had my
 4            half-sister T█████ born, and when that
 5            happened -- I think she's only like
 6            eight months old.  I don't know.  And
 7            when that happened W█████ and I went.
 8            My sister and I visited them then.  But
 9            other than that we don't really see
10            each other.
11    Q.    I believe you said you're majoring in
12          pre-med; is that correct?
13    A.    Biology pre-med, yes, sir.
14    Q.    And you're at the end of your first
15          year?
16    A.    End of my first year.
17    Q.    Now, in 2006, let's go back to that.
18          Did you go to your father and say, Dad,
19          something happened to me or did he come
20          to you and ask you if something had
21          happened?
22    A.    He came to me.  It was like a normal
23          visit, and that's just what had started
24          happening.  He was asking questions
25          about Danny and -- I mean, W█████ and
```

```
 1              I have been told, we would always ask,
 2              I would always ask dad when we were
 3              smaller why Danny, Paw Paw Danny, and
 4              Maw Maw weren't together any more.  He
 5              never really told us an answer until we
 6              got older, and he said it was because
 7              of other reasons that he said about
 8              Paw Paw Danny.  So I don't know.
 9      Q.      But as far as 2006 he came to you and
10              started asking you questions; is that
11              right?
12      A.      Yes, sir.  I mean, I came to his
13              house.
14      Q.      I'm sorry?
15      A.      I came to his house but he was asking.
16      Q.      You didn't go to him and say something
17              happened to you?
18      A.      Yes, sir.
19      Q.      He came to you?
20      A.      Yes, sir.
21      Q.      And how many times did your father talk
22              to you about this particular subject
23              before you talked with Agent McRae?
24      A.      It was like -- it was a short time
25              period because he and Wendy both talked
```

410

1     to me maybe three weeks because I

2     remember when we first started talking

3     about it he had always told me he said,

4     This is just between you and I, you

5     don't have to worry about anything.  I

6     mean, he just made me feel okay about

7     it.  And it was a short time period

8     because I remember he had got Chris

9     McRae to interview me about a couple of

10    weeks after we had talked about

11    everything.  So it was a short time

12    period.  I don't remember how long we

13    talked about it.

14   **Q.**   **And did he tell you not to tell you**

15     **your mother?**

16   A.   Yes.  He said, "This is just between

17     you and I and do not tell your mom."

18   **Q.**   **You've been living with your mother for**

19     **how many years?**

20   A.   My whole life.

21   **Q.**   **Now, after you made this statement to**

22     **Chris McRae, did you have any further**

23     **contact regarding this case with either**

24     **Chris McRae or your father?**

25   A.   Not really.  I can -- my dad probably

411

```
 1            asked me a few questions after that

 2            recently after I had talked to Chris

 3            McRae, but I can't remember because

 4            that was two years ago and I can't

 5            remember us -- I just went on with my

 6            life and just went on with it, and

 7            that's when -- until I told Walt, the

 8            investigator.  Then I thought that.

 9    Q.      You said that you came to realize that

10            what you had told Agent McRae and your

11            father was not true; is that right?

12    A.      Yes, sir.

13    Q.      And when did you come to realize that?

14    A.      It wasn't long after I talked to Chris

15            McRae.  I know Walt would probably have

16            the date that I talked to him.  It

17            could have been a month after or as

18            short a time as two weeks after I

19            talked to Chris McRae.

20    Q.      Now, how did you make contact?  Did you

21            make contact with Danny?  You didn't

22            make contact direct with Walt Merritt,

23            did you?

24    A.      No, sir.  I knew -- I found out myself

25            that Danny and -- Paw Paw Danny and
```

412

```
 1              Little Bobby came to Cato cafeteria
 2              where my sister worked, and it was one
 3              Sunday I had happened to see Paw Paw
 4              Danny and Bobby there and that's when I
 5              told him.  I said, I might not need to
 6              be talking but I need to do anything I
 7              can because I need to talk to somebody
 8              about what I need to say.  And that's
 9              when Walt got in touch with me and
10              called me and we met up.
11       Q.     And this may be just the lawyer in me
12              because we tend to maybe put too much
13              significance on particular words, but
14              your response was you said, "What I
15              need to say."  Go ahead.
16       A.     Not what I need to say.  What I want to
17              say.  I guess I correct my words.  What
18              was right to say.
19       Q.     And you're absolutely certain, are you,
20              that your father told you when he first
21              started questioning you about this that
22              he knew about Stephen?
23       A.     Yes, positive, without a doubt.  I
24              mean, that's the first thing we talked
25              about was S███████ and some other little
```

413

```
 1                 boys.
 2      Q.        Now, has anybody since this came up,
 3                has anybody told you you might could be
 4                charged with making a false report?
 5      A.        Yeah.
 6      Q.        Who told you that?
 7      A.        W       and my dad.
 8      Q.        W       and your dad?
 9      A.        Uh-huh.
10      Q.        And knowing that you still came in here
11                today to testify; is that correct?
12      A.        Yes, sir, because that's the right
13                thing to do.
14      Q.        And let me make sure I understand.   I
15                don't want to put you through this any
16                more than what I have to.  But you're
17                absolutely certain that Mr. Montgomery,
18                Danny Ray here, never in any way
19                molested you?
20      A.        No.   I love my Paw Paw Danny.  He never
21                did anything to me.
22      Q.        Has anybody threatened you about coming
23                in here to testify today?
24      A.        I can't say that they actually
25                threatened me.  I can say -- I mean, I
```

1          know I had to be served a subpoena and

2          I know my dad wanted to do that maybe

3          in a privacy matter, and I will agree

4          with him to that.  But I have been

5          called and texted by W███ and dad and

6          said this is for your benefit and I

7          hope you don't get in trouble and this

8          kind of stuff.  So they did try to

9          scare me but not really threatening.

10    Q.    And nobody on Danny's behalf has made

11          you any promises or threats or anything

12          like that, have they?

13    A.    No, sir.

14                MR. DI GIULIAN:  They may have some

15          more questions for you, B███    Thank

16          you.

17                THE COURT:  Redirect.

18                MRS. COKER:  Yes, sir, Your Honor.

19                REDIRECT EXAMINATION

20    BY MRS. COKER:

21    Q.    Good afternoon again, Stephen.  Sorry,

22          Blake.

23    A.    It's okay.

24    Q.    I've got a lot of Garretts in here

25          today.  All right.  Stephen -- B███.

1          I did it again.  I've got a couple of
2          questions for you.
3    A.    Yes, ma'am.
4    Q.    One, tell me where the house is that
5          your grandparents lived in that you've
6          visited them at?  Where was that house?
7    A.    Behind the skating rink.
8    Q.    Okay.  Is that here in Morgan County?
9    A.    Pretty sure.  Isn't the skating rink in
10         Morgan County?  I think so.  Yes.
11   Q.    So it's next to the skating rink.  How
12         close is the skating rink?  A street
13         away from the skating rink?
14   A.    Yes, ma'am.  I just always remember
15         going behind the skating rink and so
16         that's where it was.
17   Q.    And what's the name of the skating
18         rink?
19   A.    Funland Skate Castle.
20   Q.    All right.  Now, I'm going to ask a
21         couple of questions that will kind of
22         go in a different direction.  I want
23         you to follow with me.
24   A.    Okay.
25   Q.    Investigator McRae here, was the first

1           time that you met him when you gave a

2           statement to him?

3    A.   Yes, ma'am.  I don't recall any other

4           past time.

5    Q.   Okay.  Investigator McRae didn't in any

6           way that day threaten you, did he?

7    A.   No.

8    Q.   He wasn't abusive toward you that day,

9           was he?

10   A.   No.

11   Q.   He didn't offer you anything, did he?

12   A.   No.

13   Q.   Make you any promises?

14   A.   No.

15   Q.   Threaten you in any way?

16   A.   No, ma'am.

17   Q.   Give you what you needed to say?

18   A.   No.

19   Q.   Tell you a story --

20   A.   No.

21   Q.   -- that you needed to sign off on.

22          Nothing along those lines happened, did

23          it?

24   A.   No.  He did everything that he was

25          supposed to.

```
1     Q.   Professional?

2     A.   Professional, yes, ma'am.

3     Q.   And did you feel threatened at all by

4          him?

5     A.   No.

6     Q.   Now, you said that you -- I want to

7          clear up one thing.  You keep saying

8          your dad.  Now, you refer to your dad

9          as being your stepfather; is that

10         correct?

11    A.   Yes.  I called both of them my bad but

12         my dad that I thought and think of as

13         being my dad is Lynn sitting right over

14         there.

15    Q.   So I'm going to say your dad is --

16         what's his last name, Mr. Lynn?

17    A.   Morgan.

18    Q.   Morgan?

19    A.   Yes, ma'am.

20    Q.   And then Mr. Garrett, Chief Garrett, is

21         your biological father?

22    A.   Yes, ma'am.

23    Q.   Now, concerning Chief Garrett, you said

24         you haven't had that much contact with

25         him the last few years; is that true?
```

```
 1    A.    Yes, ma'am.
 2    Q.    But you talked to him not too long ago
 3          about some of your financial problems,
 4          didn't you?
 5    A.    Yes, I did.
 6    Q.    Like your car payment and things?
 7    A.    Yes, ma'am.
 8    Q.    And isn't it true that recently there
 9          have been some discussions about your
10          child support situation?
11               MR. DI GIULIAN:  Judge, we're going
12          to object.  That's between Chief Garrett
13          and his wife.  It doesn't involve this
14          young man at all.  It's not relevant.
15          It's not material.  It doesn't have
16          anything to do with the issues in the
17          case.
18               THE COURT:  Come here.
19               MR. DI GIULIAN:  And would suggest
20          if they go into it it opens the door.
21                    (Whereupon, a side bar
22                     conference was had out of the
23                     hearing of the jury and the
24                     court reporter.)
25               MRS. COKER:  That's fine.  We
```

1        withdraw that.

2                THE COURT:   Show it withdrawn.

3    Q.    (BY MRS. COKER:)   Now, you talked a

4          little bit about the fact that you came

5          to the realization that what you had

6          told Investigator McRae wasn't correct?

7    A.    Yes, ma'am.

8    Q.    And you said you came to that

9          realization when you were talking to

10         Investigator Walt?

11   A.    I didn't come to it right then.  I came

12         to it before then.  That's when I found

13         Danny to tell Walt or tell somebody

14         that I needed to talk to somebody.

15   Q.    And you are aware that Investigator

16         Walt is employed by Danny Montgomery at

17         this time?

18   A.    Yes, ma'am.

19   Q.    Working in his behalf in this case?

20   A.    Yes, ma'am.

21   Q.    And you said that your father came to

22         you -- correct me if I'm wrong.  A

23         minute ago when Mr. Di Giulian was

24         questioning you you said that your

25         father came to you about this

420

```
 1            incident.  That's how the whole thing
 2            got started.
 3      A.    Well, he and I started visiting a lot.
 4            He would call and so we came over and
 5            that's what we talked about.  That's
 6            what we would find -- we would be
 7            sitting in the living room necessarily
 8            talking about these things.  And so
 9            that's what we would talk about every
10            time I came over.
11      Q.    Have you ever given a statement to
12            anyone stating that the first person
13            you told about this within your family
14            was your mother?
15      A.    Yes, I probably said that.
16      Q.    Have you ever said that you had told
17            your mom about two weeks before I told
18            my dad?
19      A.    Yes, I probably said that too.
20      Q.    And did she give you any instructions
21            when you talked to your mom about it
22            before you told your dad?
23      A.    No, because I hadn't talked to my mom.
24      Q.    So that was all a lie?
25      A.    Yes, ma'am.  My mom didn't know --
```

421

1          sorry.

2    Q.    So if you told Investigator McRae that

3          the first person you told in your

4          family about this was your mother and

5          she gave you the advice to go tell your

6          father about it, that's not correct?

7    A.    No, ma'am.  Anything I said on that

8          recording could have been a lie, and

9          there might be some things that are the

10         truth but you're welcome to ask me.

11         I'm sorry.

12   Q.    So telling your mother first is a lie?

13   A.    Yes, ma'am.

14   Q.    Telling your friends at youth group

15         when you broke down and cried about it

16         was a lie?

17   A.    Yes, ma'am.

18   Q.    Everything that you told Investigator

19         McRae in that extensive statement that

20         day concerning your grandfather, it's

21         now your testimony that was a lie?

22   A.    Yes, ma'am.  It didn't happen.

23   Q.    Was Chief Garrett present when

24         Investigator McRae interviewed you that

25         day?

```
 1     A.     I rode with him over there, and he

 2            might have not stood by me when I was

 3            recording but he was there somewhere.

 4     Q.     He wasn't sitting at the table with

 5            y'all discussing this in your

 6            interview?

 7     A.     I don't think so.

 8     Q.     He wasn't feeding you answers while you

 9            were talking to Investigator McRae that

10            day?

11     A.     Oh, no.

12     Q.     All of this came out of your mouth that

13            day?

14     A.     Yes, ma'am.

15     Q.     The order of how it came forward, all

16            the way through the allegations of what

17            occurred between you and your

18            grandfather?

19     A.     Yes, ma'am.

20                  MRS. COKER:   No further questions

21            of this witness at this time.

22                  MR. DI GIULIAN:   I have just a

23            couple quick ones, Judge.

24                  RECROSS-EXAMINATION

25     BY MR. DI GIULIAN:
```

1    Q.    B&#9608;&#9608;&#9608;, I hate to keep putting you

2          through this.

3    A.    That's okay.

4    Q.    Is everything you said here today under

5          oath in front of these 14 folks, and I

6          know they want to know, is everything

7          you said here today the truth?

8    A.    Yes, sir, and that's why I came here.

9    Q.    And when you talked to Chris McRae and

10         gave him that statement, you knew what

11         your dad wanted you to say, didn't you?

12    A.    (Whereupon, witness nods head

13         affirmatively.)

14    Q.    And how many times did he talk to you

15         about this before --

16         MRS. COKER: I'm going to object to

17         speculation about what he knew as far as

18         his father's concerns that day, Your

19         Honor.

20         THE COURT: I'll sustain. He can't

21         testify to someone else's mental

22         operation.

23    Q.    (BY MR. DI GIULIAN:) How many times

24         did you talk to your dad before you

25         gave that statement to Agent McRae

1                        about what's in that statement?

2       A.      It wasn't several times at all.  We

3               didn't talk that much.  It was -- I

4               loved the attention from my dad that I

5               never had, and it was great to see my

6               dad to try to take care of me and ask

7               me these questions and actually care

8               about me because I never had that from

9               him.  And, I mean, some of those things

10              that I said on that tape were things

11              that necessarily my dad did not tell me

12              to say but I probably made up to

13              appease him for the attention of my

14              dad.  But, I mean, he helped me along

15              the way until I could say my full story

16              to Chris McRae.

17      Q.      And you now say today in front of these

18              14 folks that that wasn't true and that

19              this man right here never molested you,

20              never touched you in any inappropriate

21              way?

22      A.      Yes, sir, I honestly do.

23                      MR. DI GIULIAN:  Thank you, BI      .

24              I don't have any further questions.

25                      MRS. COKER:  Housekeeping, Your

1      Honor.  I want to admit 7 and 8 that we

2      dealt with earlier.

3              MR. DI GIULIAN:  You're offering

4      these into evidence?

5              MRS. COKER:  Yes, sir.

6              MR. DI GIULIAN:  We object.  He's

7      testified.  They were given to him to

8      refresh his recollection.  I don't see

9      why they need to come into evidence.

10             THE COURT:  Overruled.  Show them

11     admitted.  I don't believe that's a

12     proper objection.

13             You can stand down.  Thank you very

14     much.

15             Call your next witness.

16             MR. BEARDEN:  State of Alabama

17     calls Special Agent Chris McRae, please.

18             Come up here a minute, Tom.

19                 (Whereupon, a side bar

20                 conference was had out of the

21                 hearing of the jury and the

22                 court reporter.)

23             THE COURT:  For the record, we went

24     through a suppression hearing yesterday

25     and I'm going to give Mr. Di Giulian the

1    same objections today he had yesterday

2    and make the same ruling that I made

3    yesterday so that we don't have to waste

4    time going back through it again.

5         MR. DI GIULIAN:  That's correct,

6    Judge.  And it would be a continuing

7    objection.

8         MR. BEARDEN:  And the Defense

9    stipulates to the foundational predicate

10   necessary regarding the search.

11        THE COURT:  It's not so much a

12   continuing objection as it is the same

13   objections you made yesterday would be

14   the same today and the same rulings

15   yesterday would be the same.  So

16   whatever I ruled yesterday would be

17   consistent with today so we don't have

18   to go through that again.

19        Go ahead.  Your witness.

20        You're still under oath.

21        THE WITNESS:  Yes, sir.

22        THE COURT:  You took the oath

23   earlier today?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  You're still under

```
 1  ║           oath.
 2  ║           SPECIAL AGENT CHRIS MCRAE,
 3  ║              A witness for the State,
 4  ║        was sworn and testified as follows:
 5  ║               DIRECT EXAMINATION
 6  ║  BY MR. BEARDEN:
 7  ║     Q.    Introduce yourself to the members of
 8  ║           the jury, please.
 9  ║     A.    Special Agent Chris McRae with the
10  ║           Alabama Office of the Attorney General.
11  ║     Q.    Chris, how long you been in law
12  ║           enforcement?
13  ║     A.    Nearly 38 years.  I started out at age
14  ║           17 as a cadet with the Huntsville
15  ║           Police Department, went into the
16  ║           military after I graduated from high
17  ║           school and was a military policeman.
18  ║           From that point on I've worked at a
19  ║           number of different agencies.  I was an
20  ║           officer and a detective at the
21  ║           Montgomery, Alabama Police Department.
22  ║           I worked for the State once before as
23  ║           an investigator.  I was hired by the
24  ║           FBI.  I served in the FBI.  My boss in
25  ║           the FBI was appointed TVA first
```

432

```
 1              actual date was the 20th, but it was
 2              October 1954.
 3      Q.      If you would, obviously without getting
 4              into specific statements, tell us a
 5              little bit about the predication as to
 6              how you got involved in this particular
 7              case taking into consideration not
 8              making any direct statements.
 9      A.      Yes, sir.  On August 11th I was working
10              a matter in Jackson County, Alabama and
11              I got a call from my FBI partner.  I
12              worked on a public corruption task
13              force, and my FBI partner is in
14              Florence.  He calls me and he had Jerry
15              Garrett, Chief Jerry Garrett, on the
16              telephone.  Both my partner and I knew
17              Chief Garrett because at that time we
18              were conducting an investigation in
19              Leighton, Alabama where Jerry was then
20              the chief.  And Jerry had informed both
21              of us that --
22                   MR. DI GIULIAN:  We will object to
23              what Chief Garrett told him.
24                   THE COURT:  I'll sustain.
25      Q.      (BY MR. BEARDEN:)  What was the basis
```

```
 1              for your investigation without any
 2              statement?
 3     A.       A report that B███ G███ had been
 4              sexually abused and S███ G███ had
 5              been sexually abused.
 6     Q.       You mention that you knew Chief
 7              Garrett.  You didn't give him any
 8              preferential treatment with regard to
 9              your investigation, did you?
10     A.       No, sir, but he had already earned my
11              respect, professional respect for his
12              credibility.
13                   MR. DI GIULIAN:  Judge, he's
14              bolstering the witness.  It's not
15              relevant and not material, we object.
16              Talking about he earned his respect.
17                   THE COURT:  Overruled.
18                   MR. DI GIULIAN:  It's not relevant
19              or responsive.
20                   THE COURT:  Overruled.  He can
21              testify to that.
22     Q.       (BY MR. BEARDEN:)  Special Agent McRae,
23              what did you do as a result of this
24              report?  What did you do?  Just tell
25              us, walk us through what a Special
```

434

1        Agent with the Attorney General's
2        office does or specifically in this
3        case what did you do after you got this
4        report?
5    A.   In this case I first contacted S█████
6        G██████ and requested that he write me
7        a statement and send me a statement as
8        to his allegations.  Shortly
9        thereafter, just a few days after I
10       received S█████ G██████ written
11       allegations.  I scheduled interviews
12       first with him and then an interview
13       with B███ G████.  Both those
14       interviews were recorded and conducted
15       separately, separate days, separate
16       locations.
17   Q.  What happened next?
18   A.   I evaluated the information from the
19       allegations.  I did some other
20       investigative work on the ground so to
21       speak to determine whether or not the
22       allegations seem to be credible.  They
23       did.  I made a recommendation to my
24       boss back in Montgomery that we open a
25       formal investigation, and my boss

1          agreed with my recommendation.  I was

2          assigned on the investigation.

3     Q.   And you did, in fact, open an

4          investigation at that time?

5     A.   Yes, sir.

6     Q.   Can you approximate what time from a

7          date standpoint when the investigation

8          was opened?

9     A.   It was in August 2006.  It was

10         mid-August.  I don't recall the precise

11         date that the boss officially endorsed

12         my recommendation.

13    Q.   At that point in time did you seek an

14         arrest warrant for Mr. Montgomery?  I

15         think you mentioned that you went out

16         and talked with others, but once you

17         got the information did you ultimately

18         seek an arrest warrant for

19         Mr. Montgomery?

20    A.   I did.

21    Q.   Was there anything about your

22         preliminary investigation that as a

23         former FBI agent and officer for 38

24         years that clicked a bell and says I

25         may need to take precautions in the

```
 1         ordinary course?

 2    A.   Sure.

 3              MR. DI GIULIAN:  Judge, we will

 4         object.  Calls for an opinion on facts

 5         not in evidence.

 6              THE COURT:  Overruled.

 7    A.   Well, first of all, during my 38 years

 8         I've had the unfortunate experience of

 9         having to --

10              MR. DI GIULIAN:  Judge, we will

11         object to him going into what his

12         unfortunate experiences are.  It's

13         irrelevant and immaterial.

14              THE COURT:  Just listen to the

15         question and answer the question

16         directly without the benefit of the

17         background.

18    A.   Yes, sir.  There were some things that

19         I considered before the arrest.

20    Q.   (BY MR. BEARDEN:)  What were those

21         considerations?

22    A.   Safety first.

23    Q.   And what were the specifics of your

24         safety concerns?

25    A.   Safety concerns were information that
```

```
 1          Mr. Montgomery --

 2              MR. DI GIULIAN:  Judge, we will

 3          object to anything that's hearsay, he

 4          doesn't know of his own personal

 5          knowledge.

 6              THE COURT:  Overruled.

 7   A.     The information that Mr. Montgomery was

 8          emotionally unstable, information that

 9          Mr. Montgomery --

10              MR. DI GIULIAN:  Judge, we object.

11          Calls for a conclusion and he's

12          testifying what people told him.

13              MR. BEARDEN:  Lay opinion, Your

14          Honor, what he learned in the course of

15          his investigation.

16              THE COURT:  I'll overrule.

17              MR. DI GIULIAN:  Judge, could we

18          have an instruction that what he's

19          testifying to is not to be taken for the

20          truth?

21              THE COURT:  Mr. Di Giulian, I

22          really don't know what he's testifying

23          to yet.  You're objecting before he's

24          ever testified and in anticipation of

25          what he's going to say.  I don't know
```

438

```
 1        what he's going to say.

 2            MR. DI GIULIAN:  I'm objecting to

 3        what he's already saying people have

 4        told him things about Mr. Montgomery.

 5        He's learned things about

 6        Mr. Montgomery, and the only way he

 7        could have learned those things is for

 8        somebody else telling him.

 9            THE COURT:  The statement -- what

10        he learned is not inadmissible.  The

11        statement of what they said specifically

12        is what would be inadmissible.  He's

13        laying a predicate now.

14            MR. DI GIULIAN:  But if the Court

15        would give an instruction that the jury

16        cannot consider what he learned as proof

17        of the truth of what he says he learned

18        but simply what he acted on and doesn't

19        mean that it's true.  I think I'm

20        entitled to that instruction.  I didn't

21        state that very well.  I'm sorry.

22            MR. BEARDEN:  Judge, we're not

23        eliciting hearsay.  What I'm trying to

24        get at is his investigation.

25            THE COURT:  I'm not going to.  Just
```

```
 1                    go ahead with your line of questioning.

 2                    The line of questioning is not improper

 3                    that I can understand.

 4       Q.    (BY MR. BEARDEN:)  Chris, what were you

 5             concerned about as an agent?

 6       A.    Safety first, always first.

 7       Q.    Specifically?

 8       A.    Safety for the agents that were with

 9             me, safety for the people that might be

10             in the house, safety for

11             Mr. Montgomery.

12       Q.    Would it be fair to say that your

13             investigation caused you to have those

14             concerns?

15       A.    Yes.

16       Q.    You made that conclusion.  Is there

17             something specific that you learned?

18       A.    Yes.

19       Q.    What was that?

20       A.    Information --

21                    MR. DI GIULIAN:  Judge, can I voir

22             dire the witness, please?

23                    THE COURT:  For what purpose?

24                    MR. DI GIULIAN:  I want to find out

25             how he knows that information.
```

```
1              THE COURT:  The fact that he
2         learned information during the
3         investigation is admissible.  Unless he
4         attempts to quote a witness verbatim for
5         what they said then it would be a
6         hearsay objection.  So, no, let's
7         proceed.
8    Q.   (BY MR. BEARDEN:)  If I may, I'll just
9         specifically ask you.  In the course of
10        your investigation did you learn that
11        there could potentially be firearms in
12        the presence of this Defendant?
13   A.   Yes.
14   Q.   As a consequence of that potentiality,
15        not actuality but potentiality, you
16        were concerned with a number of things
17        which you just identified?
18   A.   Right.
19   Q.   Would it be fair to say that you were
20        concerned for your agents?
21   A.   I was.
22   Q.   And you mentioned you were actually
23        concerned for the Defendant?
24   A.   Right.
25   Q.   Was there any other individuals that
```

441

```
 1              you might have been concerned for?
 2    A.        A disabled man that has been identified
 3              previously as B▮▮ T▮▮▮.
 4    Q.        That would be Little B▮▮▮
 5    A.        Little B▮▮▮▮
 6    Q.        So all those considerations were made
 7              on your part prior to executing this
 8              search warrant or arrest warrant?
 9    A.        Yes, sir.
10    Q.        The Defense has stipulated to the
11              foundation of everything we talked
12              about yesterday.  Did you, in fact,
13              come forward with your arrest warrant?
14    A.        I did.
15    Q.        Okay.  Do you recall when that took
16              place?
17    A.        September 1st, 2006, at about 6:30 in
18              the morning.
19    Q.        What location did you execute your
20              arrest warrant?
21    A.        I don't recall the precise address but
22              it's at Mr. Montgomery's residence
23              which at that time was located in a
24              house directly behind the Skate Castle
25              on the Funland Amusement Park complex.
```

1    Q.    Okay.  And talk through, if you will,

2          the execution as we did previously of

3          your arrest warrant.

4    A.    First thing I did was coordinate with

5          the Decatur Police Department to get

6          two uniformed officers and two marked

7          units out there.  Again safety.  I

8          assigned members of the arrest team to

9          their specific tasks which included

10         covering the back entrances of the

11         house with both uniformed and plain

12         clothes agents, uniformed Decatur

13         officers and plain clothes AG agents.

14         I went to the front door with the

15         uniformed Decatur officer and a plain

16         clothes agent, knocked on the door, and

17         Mr. Montgomery answered the door.

18   Q.    What happened after he answered the

19         door?

20   A.    He was immediately taken into custody.

21         He was immediately handcuffed and

22         controlled.  We did a protective sweep

23         through the house to identify if there

24         were any threats in the house and also

25         to identify where Little Bobby was and

443

```
 1              take care of him.
 2     Q.       Did you ever threaten the Defendant
 3              when you did that?
 4     A.       No.  I warned him that he was under
 5              arrest.
 6     Q.       Did you have an opportunity to read him
 7              his rights?
 8     A.       A few minutes later, yes, sir.
 9     Q.       With safety precautions and --
10     A.       Right, after we did the protective
11              sweep.
12     Q.       Were you able to procure from the
13              Defendant a search warrant in this case
14              of the residence?
15     A.       It wasn't a search warrant.  It was
16              consent to search.
17     Q.       Okay.  Talk about what that is just in
18              case somebody may not know the
19              difference between something like that.
20     A.       Okay.  Mr. Montgomery was sitting in
21              the back seat of a Decatur police car
22              in the prisoner cage, and I had
23              previously advised him of his rights
24              verbally and he had verbally waived
25              those rights.  I went back to him, told
```

444

```
 1              him I wanted to search.  I asked him if
 2              I could search the house.  He agreed.
 3              I also asked to search two vehicles
 4              that were parked at the residence.  I
 5              unhandcuffed him long enough for him to
 6              sign the consent form.
 7    Q.        So you actually received an oral
 8              consent to search and then you
 9              ultimately came back?
10    A.        Right.
11    Q.        Let me show you what's previously been
12              marked as State's Exhibit 3 and 4 for
13              your identification.
14    A.        Yes, sir.
15    Q.        Do you recognize what those exhibits
16              are?
17    A.        Exhibit 3 is a consent to search form
18              that's specific for a Ford Van that was
19              parked at the residence and also a Ford
20              F-150 truck parked at the residence.
21              The form reads -- do you want me to
22              read it?
23    Q.        I think the general gist of it is
24              fine.
25    A.        It's signed by Mr. Montgomery.  It's
```

```
 1              also signed by me and dated September

 2              1st, 2006.

 3    Q.    Does State's Exhibit Number 3 clearly

 4          and accurately represent the consent to

 5          search document that was executed by

 6          Mr. Montgomery on that date?

 7    A.    Yes, sir.

 8    Q.    Same thing with Number 4, please.

 9    A.    Exhibit Number 4 is another consent to

10          search form that's specific to the

11          house, and the house address is

12          apartment          14th Street

13          Southeast, Decatur, and the contents

14          therein.  It's dated September 1st,

15          2006.  It was signed by Mr. Montgomery

16          in my presence and I also signed it.

17              MR. BEARDEN:  Thank you very much.

18              Admitted for those purposes.

19    Q.    (BY MR. BEARDEN:)  Let's talk about

20          you've had the safety concerns, you've

21          gotten the consent to search.  Where is

22          Mr. Montgomery at this time.

23    A.    Mr. Montgomery at that time was --

24          initially he was sitting in the back

25          seat of the Decatur Police Department
```

```
 1              car in the driveway.  I then cleared
 2              the car to go ahead and the officer
 3              driving the car to go ahead and
 4              transport Mr. Montgomery to the Morgan
 5              County detention facility, which he
 6              did, and he was held there until my
 7              arrival sometime later.
 8        Q.   All right.  With respect to Little
 9              Bobby, where was Little Bobby at this
10              point in time?
11        A.   I had made prior arrangements before
12              the arrest execution to have Chief
13              Jerry Garrett, I instructed him to be
14              five minutes away from that house and
15              to have his cell phone on.  And then
16              once we had the house secure and
17              everything was safe I was going to call
18              him to come in and take care of Little
19              B████ rather than Little B████ having
20              to go to DHR.
21        Q.   And did Chief Garrett, in fact,
22              actually arrive later?
23        A.   He did.
24        Q.   Okay.  And was Little Bobby actually
25              taken in care I guess would be the way
```

```
 1              I would put it?
 2   A.     Yes.  And that was before Mr. Garrett
 3          -- I mean before Montgomery rather
 4          departed in the police car.  I asked --
 5          I told Mr. Montgomery that I had Chief
 6          Garrett coming to take care of B███
 7          and asked if that was okay with him.
 8          He said it was.  He asked to talk to
 9          Chief Garrett, discuss some medication
10          issues.  I allowed that to happen.  And
11          Chief Garrett took custody of or
12          responsibility for Little B███
13   Q.     Would it be fair to say that you
14          conducted your search of the residence
15          at that time?
16   A.     Yes.
17   Q.     Okay.  Let's talk a little bit about
18          that.  From a generalization
19          standpoint, do you know the layout of
20          the house from your personal
21          observations?
22   A.     The house was a two-level house.  You
23          entered through a front door and there
24          was I believe a small entrance foyer
25          right there.  You make a right turn
```

```
 1              upstairs.  At the top of those stairs
 2              there was a bedroom on either side of
 3              that stairway.  It didn't appear to be
 4              used for anything other than storage.
 5       Q.     At that point in time -- we mentioned
 6              earlier in the first part of your
 7              direction examination we discussed your
 8              specialized training I guess you said
 9              dating back however many years but more
10              specifically recently relative to
11              criminal sex crimes.
12       A.     Yes.
13       Q.     In that training were you taught,
14              personally taught, certain things to be
15              observant of or to look for?
16       A.     Sure.  One of the things are pictures
17              or souvenirs of activity that suspected
18              child predators may have been involved
19              in.
20       Q.     Okay.  Anything else that you might be
21              looking for?
22       A.     Well, you look for, you know,
23              videotapes, you look for writings that
24              may record activities or fantasies, of
25              course, the pictures and other
```

450

```
 1              memorabilia.
 2    Q.    In the realm of dealing in your ICAT
 3          training is there anything you look for
 4          from that standpoint?
 5    A.    Sure.
 6    Q.    Would it be fair to say that you found
 7          a computer in Mr. Montgomery's home?
 8    A.    No, sir.
 9    Q.    Did you observe anything relative to a
10          computer?
11    A.    We found a computer desk with a
12          keyboard, cables all connected, I think
13          there was a printer, there was a screen
14          for sure, but the CPU of the computer,
15          the processing unit itself was missing.
16    Q.    Were you able to locate any of the
17          other items that you discussed
18          potentially looking for?
19    A.    Yes. 'Hundreds of pictures.
20    Q.    What were the observations in the
21          pictures?  What did you observe in the
22          pictures?
23    A.    Most of the pictures were pictures of
24          white male preteens.
25    Q.    White male preteens.  Can you based on
```

451

```
 1            your experience and training estimate
 2            as to the age of the individuals
 3            depicted in the pictures?
 4    A.      Generally they probably ranged from
 5            about age 6 to 12, 13 years old.
 6            Thirteen not being a preteen but they
 7            could have --
 8                 MR. DI GIULIAN:  Judge, I think at
 9            this time I'm going to object and move
10            to strike the testimony about pictures
11            that were found in the house on these
12            grounds.  I filled a motion for
13            discovery and the State responded and
14            sent me about twelve pictures.  If they
15            intend to either discuss or introduce
16            more than what they sent me then, of
17            course, that's a violation of this
18            Court's discovery order and should not
19            be allowed.
20                 MR. BEARDEN:  We are not intending
21            to use them.  We're having a discussion
22            as to what his observations were.
23                 THE COURT:  Overruled.
24    Q.      (BY MR. BEARDEN:)  At that point in
25            time you mentioned that you couldn't
```

452

```
 1              find a computer and you didn't find a
 2              computer.
 3      A.      Yes, sir.
 4      Q.      You found the pictures, numerous
 5              pictures of preteen boys.  Was that
 6              your --
 7      A.      Yes.
 8      Q.      I don't want to misquote what you said.
 9      A.      Yes.
10      Q.      What did you do next in your
11              investigation?
12      A.      Well, there was a lot of moving parts
13              of this investigation.  I don't know
14              precisely what came next.  That
15              particular day after we completed the
16              search, seized property of potential
17              evidentiary value, I left part of the
18              team there, part of the AG team that
19              was conducting the search, and I went
20              downtown to the detention facility or
21              came downtown here and attempted to
22              interview Mr. Montgomery.
23      Q.      Okay.  At that point in time you say
24              you came back downtown and you actually
25              face-to-face sat down with the
```

```
 1              Defendant.  At that point in time did
 2              you go back through his rights and
 3              remind him of everything that had been
 4              done?
 5      A.      Yes, sir.  Not only that but while I
 6              was recording it I asked him if he
 7              could acknowledge that I had read him
 8              his rights at the scene and that he had
 9              signed those consent to search forms at
10              the scene.  But I read his rights again
11              freshly there at the detention
12              facility.
13      Q.      Okay.  Did you threaten him?
14      A.      No, sir.
15      Q.      Coerce him?
16      A.      No, sir.
17      Q.      Sling him around a little bit?
18      A.      No.
19      Q.      You had an opportunity to talk with
20              him, and would it be fair to say that
21              he invoked his rights?
22      A.      He did.
23      Q.      Okay.  Now, you continued your
24              investigation.  Obviously we're here
25              today without, again as the Judge said,
```

454

1              without specifically saying what

2              anybody told you, were you able to find

3              anything else that's relevant to what

4              the State's motive is in this case?

5     A.    Yes.

6     Q.    What would that be?

7     A.    I identified other individuals with

8              similar experiences as the allegations

9              I was investigating.

10    Q.    Could you give me the names of any

11             individuals that you have talked with

12             specifically?

13    A.    Sure.

14    Q.    Give me three.

15    A.    Shane Campbell is one, Mark Miller is

16             another one, Eric Rutherford is the

17             third.

18    Q.    Did you have an occasion to sit down

19             with these individuals relative to what

20             they intended to talk about regarding

21             the State's motive?

22    A.    I did.

23    Q.    Did they agree to cooperate with you?

24    A.    They did.

25    Q.    Is there anything about your

455

```
 1              investigation as far as going to the
 2              house that I might have missed that you
 3              --
 4      A.      Yes, sir.
 5      Q.      Okay.
 6      A.      During the search and the activities
 7              that were ongoing at the time of the
 8              search there was -- I observed
 9              photographs and writings within the
10              house that suggested there may be
11              ongoing activity.
12      Q.      After the Defendant invoked his rights,
13              we met yesterday and talked about
14              everything, you personally as an agent
15              for the Office of the Attorney General
16              respected those rights?
17      A.      Yes, sir.
18      Q.      Didn't ask him another question?
19      A.      That's right.
20      Q.      You did not ask him another question?
21      A.      I did not.
22      Q.      What happened next in terms of your
23              investigation?
24      A.      I conducted other logical
25              investigation, other interviews,
```

1          MR. BEARDEN:  I'll rephrase if it

2     will help the Court.

3          THE COURT:  It will.

4    Q.   (BY MR. BEARDEN:)  Let me lay a

5     foundation question and then I'll

6     connect them up if you don't mind, Your

7     Honor.

8          In the training that you discussed

9     earlier, we talked about you're looking

10     to make certain observations and you're

11     looking for certain things.  The

12     photographs that you actually on that

13     day recovered during the search, would

14     they match what you and your training

15     should be looking for?

16    A.   Yes.

17    Q.   And what would that be in terms of, you

18     know, not specifically about any

19     particular item, we're not going to

20     introduce any of them, but generally

21     speaking what were you looking for?

22    A.   Totality of the circumstances pointed

23     me toward -- suggested to me that this

24     investigation involved a preferential

25     sex offender.

1    Q.   In terms of that, explain to the

2         members of this jury based on your

3         training and your perception what a

4         preferential sex offender is considered

5         to be based on that training.

6    A.   A preferential sex offender is an

7         offender who has a preference, as the

8         name would suggest, toward certain

9         sexual activities or partners.  They

10        often have a well-defined technique

11        such as manipulation or seduction they

12        use to victimize individuals.  They

13        often memorialize their activities with

14        photographs, tapes, writings, and so

15        forth so they can review them later and

16        fulfill sexual fantasies that they

17        have, and the totality of this

18        investigation suggested to me that's

19        what I was dealing with.

20    Q.   On that particular incidence based on

21        your observations of the specific

22        things that you saw and recovered, was

23        there an age demographic generally

24        speaking as best of your observations,

25        what would be the age demographic that

```
 1            you recognized in this instance?
 2    A.    It appeared to be ages six through
 3          about twelve.
 4              MR. BEARDEN:  I have nothing
 5          further at this time.  Mr. Di Giulian is
 6          going to ask you some questions.  Please
 7          answer truthfully all his questions.
 8              THE COURT:  Sure.
 9                 CROSS-EXAMINATION
10    BY MR. DI GIULIAN:
11    Q.    Agent McRae, have you ever been in
12          other folks' homes and looked at
13          pictures they may have?
14    A.    Yes, sir.
15    Q.    And it's not uncommon for people to
16          have pictures of friends in their home,
17          is it?
18    A.    Not at all.
19    Q.    And it's not uncommon to have pictures
20          of the children of friends, is it?
21    A.    No, sir.
22    Q.    And it's not uncommon if you happen to
23          work at the Skate Castle to have
24          pictures of kids who skate, is it?
25    A.    I don't know.
```

```
 1              do with this.
 2                   MR. DI GIULIAN:  Judge, he
 3              testified about it on direct.  I can ask
 4              him about it on cross.
 5                   THE COURT:  I'll let you.  Go
 6              ahead.  I fail to see the relevance to
 7              be honest with you, but maybe you can
 8              connect it up and I'll see it, the light
 9              will come on for me.
10     Q.      (BY MR. DI GIULIAN:)  What was his
11             condition?
12     A.      He was seated in a wheel chair.  He was
13             dressed.  As I recall he was in the
14             kitchen area or right at the door, the
15             kitchen hallway door.
16     Q.      Were you able to determine whether or
17             not he could communicate?
18     A.      I don't think he can.  Maybe a
19             caregiver could understand some of his
20             attempts to communicate but I could
21             not.
22     Q.      And that caregiver was Danny
23             Montgomery?
24     A.      As far as I know, yes, sir.
25     Q.      Did Bobby appear to be in good
```

 

| | | |
|---|---|---|
| 1 | | condition? |
| 2 | A. | Yes, sir. |
| 3 | Q. | **Now, when you walked in the door did** |
| 4 | | **you stick your gun in Mr. Montgomery's** |
| 5 | | **face when you arrested him?** |
| 6 | A. | I wouldn't have stuck it in his face |
| 7 | | but I did have my gun out. |
| 8 | Q. | **Had your gun out?** |
| 9 | A. | Yes, sir.  Don't aim at the face.  You |
| 10 | | aim at the body. |
| 11 | Q. | **Mr. Montgomery was completely** |
| 12 | | **cooperative with you?** |
| 13 | A. | He was compliant, yes, sir. |
| 14 | Q. | **Didn't fight with you or anything?** |
| 15 | A. | No, sir. |
| 16 | | MR. DI GIULIAN:  I don't have any |
| 17 | | further questions at this time. |
| 18 | | MR. BEARDEN:  Judge, I don't |
| 19 | | either. |
| 20 | | THE COURT:  Thank you, sir.  You |
| 21 | | may stand down. |
| 22 | | THE WITNESS:  Thank you. |
| 23 | | THE COURT:  Call your next witness. |
| 24 | | MR. BEARDEN:  State of Alabama |
| 25 | | calls Mr. Eric Rutherford. |

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,      )
     )
     Petitioner,      )
     )
vs.      )      **CASE NO: CC 06-988.60**
     )
STATE OF ALABAMA,      )
     )
     Respondent.      )
     )

## ORDER

This cause is before the Court on petitioner's Petition for Relief from Conviction or Sentence pursuant to Ala. R. Crim. P. 32 and his request to proceed *in forma pauperis*. Upon consideration of this request and the documents filed in support thereof, the Court is satisfied that the Petitioner is indigent. Accordingly, he will be allowed to proceed without pre-payment of the civil docketing fee. The State shall have sixty (60) days from the date of this Order within which to file a response to the petition.

The Clerk shall provide copies of this Order to the Petitioner and the District Attorney.

**ORDERED** and **DONE** on this the 29th day of December, 2010.

**GLENN E. THOMPSON,**
**CIRCUIT JUDGE**

2010 DEC 30 AM 10: 02

CIRCUIT COURT
FILED
MORGAN COUNTY ALABAMA

1/5/11 Copies

IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,                    )
         PETITIONER                     )
                                        )
VS.                                     )          Case No. CC-06-988.60
                                        )
STATE OF ALABAMA,                       )
         RESPONDENT                     )

### STATE'S MOTION TO RULE BASED UPON PLEADINGS
### STATE'S MOTION TO DISMISS PETITION

   COMES NOW THE STATE OF ALABAMA, the Respondent, by and through Garrick
L. Vickery, Assistant District Attorney for the Eighth Judicial Circuit, and moves this Honorable
Court to dismiss the above-styled action pursuant to Alabama Rules of Criminal Procedure 32.7.
As grounds for said motion, the Respondent states as follows:

1. In the instant Rule 32 Petition, Lyle Montgomery raised the following issues: (1) That his trial
counsel was ineffective for several reasons, (2) that the search of his residence was unlawful and
improper and, (3) that the charging instruments in this case were defective.

2. As to these issues, the State responds as follows:

**STATE'S RESPONSE TO ISSUE (1).** The Petitioner alleges that his trial counsel was
ineffective for a variety of reasons. Among them are that his trial counsel failed to file a motion
to suppress the statement that the Petitioner gave to police, claiming it was unlawfully made
without adequate *Miranda* protections (see Petition at pgs. 13, 20, and 21). The Petitioner also
complains that his trial counsel failed to move to dismiss the indictment because it was obtained
using allegedly perjured & coerced testimony to the grand jury (see Petition at pgs. 26 and 28).
Both of these issues are without merit.
   In the instant Rule 32 Petition, the Petitioner has included the transcribed police interview
that he now complains trial counsel should have moved to suppress (Attached as State's Exhibit
"A"). In the transcription, Chris McRae, an investigator for the Alabama Attorney General's
Office both reads the Petitioner his *Miranda* rights, and also refers to a time in the recent past
when they were read to him again. To the extent that the Petitioner now claims that his trial
counsel should have moved to suppress the statement on *Miranda* grounds, there appears to be
no factual basis in the record to support that contention. Further, the Petitioner has failed to
indicate how he was prejudiced at all by the statement coming into evidence. Thus, this issue
fails as meritless, and it also fails to comply with the specificity requirement found in Ala. R.
Crim. P. 32.6(b).
   Similarly, the Petitioner's allegations regarding grand jury testimony must also fail as
meritless. The Petitioner includes no grand jury testimony in his petition which was perjured or
coerced in any way, nor does he include how such testimony prejudiced him in any way. As it
does above, this issue also fails to comply with Ala. R. Crim. P. 32.6(b)

It should also be noted that the Petitioner had a different appellate counsel than his trial counsel. Thus, his claims of ineffective assistance of counsel either were, or could have been raised on appeal, and are precluded from review in this petition. Ala. R. Crim. P. 32.2(a)(4) & (5). *See also* Cain v. State, 712 So. 2d 1110 (Ala. Cr. App. 1997).

**STATE'S RESPONSE TO ISSUE (2).** The Petitioner alleges that he is due relief because a warrantless search of his residence was conducted by police when he was arrested. Although couched as a challenge to this Court's jurisdiction, this issue presents nothing upon which relief can be given in the Rule 32 context.

**STATE'S RESPONSE TO ISSUE (3).** The majority of the Petitioner's arguments here rest on the complaints issued by the District Court of Morgan County, and not the indictment on which he was tried. The Petitioner argues that the complaint was too vague to establish probable cause to arrest him. It appears, however, that the complaint issued by the magistrate sufficiently tracks the language of the statute upon which the Petitioner was charged, and is therefore valid.

3. The State also generally avers the petition is untimely, and fails to state a claim upon which relief can be granted. There is no material issue of law or fact exits which entitles him to relief, and failure to grant this petition will not result in a miscarriage of justice as the petitioner has had every right afforded to him.

Wherefore, the State of Alabama respectfully requests this Honorable Court to consider the matter submitted and dismiss the petition.

Submitted on this day: March 1, 2011.

Certificate of Service

I hereby certify that I have on the submitted date as noted above served a copy of the foregoing on the petitioner by placing the same in U.S. First Class Mail, Postage Prepaid to Lyle Montgomery, AIS # 263476, at Perry County Correctional Facility.

Garrick L. Vickery

Garrick L. Vickery
Assistant District Attorney

  

143

## ALABAMA ATTORNEY GENERAL'S OFFICE
## INVESTIGATIVE DIVISION
## INVESTIGATIVE REPORT FORM



STATE'S
EXHIBIT

A

**October 24, 2006**
**TRANSCRIPTION DATE**

**NAME:**       Lyle Dan Montgomery
**ADDRESS:**
               Decatur, AL
**TELEPHONE:**  N/A

Montgomery provided the following information after being advised of my official identity
and after being advised of the nature of the Attorney General's investigation. The interview
took place at the Morgan County Jail and I was assisted by Decatur Police Sergeant Terry
White.

I reviewed for accuracy the following transcript of Martell's interview on January 4, 2007.
The initials CM, TW, and LM appearing in the transcript identify the speaker as Chris
McRae, Terry White and Lyle Montgomery, respectively.

### TRANSCRIPT

CM:   The recorder is on. This is Chris McRae with the Alabama Attorney General's
      Office. I'm at the Morgan County Jail with Sergeant Terry White from the Decatur
      Police Department and we are getting ready to speak to Mr. Dan Montgomery about
      the crime he is charged with which is Sodomy in the 1st Degree. Sergeant White
      would you introduce yourself just so the secretary can recognize your voice?

TW:   Sergeant Terry White Decatur Police Department, Special Victims Unit.

CM:   Mr. Montgomery would state your name?

LM:   Yes. My name is Lyle Daniel Montgomery.

CM:   Alright thank you. The time is... first of all the date is September 1, 2006, the time
      is approximately ten minutes after nine o'clock, a.m. Again, we are in the Morgan

---

**DATE OF INTERVIEW** September 1, 2006 **AT** Morgan County Jail, AL

**BY** Chris McRae                          **SPECIAL AGENT(S),**

**FILE #** 99047-001



#5

DOC# 195373

 

**Page 2**                                                                    File # 99047-001

County Jail in Decatur, AL. Before we ask any questions Mr. Montgomery I am going to again advise you of your rights. I advised you of your rights at the scene, is that correct?

LM:   That's correct.

CM:   Ok, and you signed right's waiver form... no I just advised you of your rights so you didn't sign any form I don't believe at that time.

LM:   I think I was going to sign one and you had the wrong form. I think.

CM:   But you did sign two consent to search forms, correct?

LM:   Yes.

CM:   Consent to search your home or your residence, Apartment███████████ 14th Street Southeast, Decatur, AL…..

LM:   That's correct.

CM:   …And, to search two vehicles parked in your driveway…your personally owned van and a red Ford F-150 pickup truck that is your work truck that's assigned to you to drive home.

LM:   That's correct.

CM:   Thanks. Before we ask any questions about the matter we are going to discuss this morning, I am going to advise you of your rights again and I'm going to tell you again as I told on the scene that you are charged with 1st Degree Sodomy.

LM:   Ok. What does that mean?

CM:   It means that you had deviate sexual intercourse with a child under twelve when you were over sixteen. And we will get into it in further detail if you want to talk to us. Before I ask you any questions I want to tell you that you have the right to remain silent do you understand that?

LM:   Yes, sir.

CM:   Anything that you say can be used against you in court. Do you understand that?

LM:   Yes, sir.

CM:   You have the right to consult with an attorney before I ask you any questions and to have an attorney present during questioning. Do you understand that?

LM:   Yes, sir.



**Page 3**    File # 99047-001

CM:  If you desire to consult with an attorney prior to questioning and or have an attorney present during questioning but cannot afford to retain one, one will be provided for you before we question you. Do you understand that?

LM:  Yes, sir.

CM:  If you decide to answer questions now, with or without an attorney, you have the right to stop answering the questions at any time. Do you understand that?

LM:  Yes, sir.

CM:  Ok. Do you want to talk to us?

LM:  I would like to find out what's going on yes, sir. First, may I ask how Bobby is?

CM:  Bobby is fine his...Bobby Garret, for the record, is who were talking about, correct?

LM:  No, Bobby Thorn.

CM:  Bobby Thorn, I'm sorry. He is fine. Jerry his brother... half brother... is there with him; his mother is there with him...

LM:  Ok. Good.

CM:  As is her husband, what is his name ,Eddie Kirby?

LM:   I don't know him,. Kirby.

CM:  Yeah, Kirby.

LM:  Doc Kirby's son?

CM:  Yeah. The three of them were there when I left.

LM:  Ok.

CM:  So he is being well taken care of,

LM:  Ok,

CM:  So you do want to go ahead and we will proceed with the interview?

LM:  Yeah, I would like to start and kind of see what's going on?
CM:  Ok,




**Page 4**

LM:  Then I reserve the right to call a lawyer if it sounds very, very serious.

CM:  Absolutely it its.  What education level do you have?

LM:  High School.

CM:  Do you read and write?

LM:  Yes.

CM:  Ok.  Would you read back this waiver of rights form and read it out loud please?

LM:  I don't have my reading glasses.  I understand the nature of the investigation I understand my rights I affirm that no threats or promises have been made to me and I affirm that I have been "cosured".

CM:  ...Coerced.

LM:  Coerced or pressured into making a statement.  I agree to be interviewed without an attorney being present at this time.

CM:  Ok.  Is that correct?

LM:  That is correct.

CM:  Alright, would you print your name on the top line right here.  Please put the date which is September 1, there and the time which is... it is now, we'll call it 9:15 am and then sign under there.  Thank you, and I need to sign it.  Sergeant White.

Ok.  Mr. Montgomery I'm going tell you a little bit about me because I want you to understand where I'm coming from and I'm going to add some context.  I have been on the job a while.  I'm fairly blunt and fairly straight forward, I'm not going to play games with you, I don't want you to play games with me.  If you want to stop talking, stop talking anytime.  But, the only thing that will anger me or get me riled-up is if you tell me something that's not true.  I'd rather you just tell me you don't want to talk about it.  Ok.  Some of the questions that Sergeant White and I are going to ask you and talk about we already know the answers to.  We didn't fall off the truck last night you know and we have done a good bit of the investigation.  Some of the questions that we are going to ask you we don't know the answer to.  You are not going to know which ones are which, but if we sense that you know that you are being less than candid with us that will tick me off.  I don't know how it will affect Sergeant White.  It will not tick me off at any point if you just say hey, time out I don't want to talk anymore or I don't want to answer that question and we will move on to the next question.  It will not offend me the least bit.  So I just want to lay that on the table.  So that we understand each other on that.



**Page 5**                                                  File # 99047-001

LM:   Yes, sir.

CM:   Ok. To get to the point I received... the Attorney General's Office received a complaint about two weeks ago that you had sexually abused your former step grandson, Blake Garrett...you know Blake I suppose?

LM:   Yes.

CM:   Ok. I'm aware that you are generally... that you know that Blake talked to his parents about that complaint, is that correct?

LM:   No.

CM:   Ok. So Jerry Garrett hasn't talked to you about it?

LM:   No.

CM:   Ok.

LM:   I did not, have not ever molested in any way form or fashion, Blake.

CM:   When we start investigating that allegation that led to other people who, both in and outside the Garrett family...your former family, that alleged that you had not only molested them but sodomized them. Do you know the definition of sodomy?

LM:   Is that anal?

CM:   No it's not... it can be, but it's also oral sex.

LM:   Oh, ok.

CM:   It's... legally the lawyers call it deviate sexual intercourse but it's a number of different acts. Anal sex is one and oral sex is another. These victims alleged that the acts occurred when they were young boys. Generally speaking, we will get into some specifics in a little bit. They were under the age of twelve when it happened...some as young as six. The one that I would like to start with is Stephen Garrett. Do you know Brian Stephen Garrett?

LM:   Oh yeah, he is my middle stepson.

CM:   Ok. When did he become your stepson?

LM:   '84. His mother and I married in '84.

CM:   Ok. How long were you married to his mother?

**Page 6**

File # 99047-001

LM: Thirteen years.

CM: Alright, so that would have been about 1997 that you divorced?

LM: '97 or '98. I have trouble remembering the exact date without looking it up. B████ was... I would have to look it up to be for sure, it's in that general area.

CM: Ok. When did you meet S██████? Did you meet him before you married his mother?

LM: Yeah, I think probably a couple of years before we married. It was after my dad passed away. He passed away in '90. I know I didn't know him before then. It was sometime after then. Not '90....'80.

CM: Ok. Alright, where did you meet him?

LM: To tell you the truth, I don't know exactly, I'm not sure if it was the skate rink or if it was at someone's house.

CM: Ok. You were working at the skating rink in those days... during... as far back as 1980?

LM: Yeah.

CM: When did you actually start working there?

LM: '74.

CM: Ok. You do what? What was you're...

LM: ...work on the floor and assistant manager.

CM: Ok, when you say work on the floor...

LM: Yeah, floor.

CM: ...supervise the skaters?

LM: Yeah.

CM: Ok, and you do that part time?

LM: Yeah.

CM: What's your full time job?

**Page 7**                                                           File # 99047-001

LM:   QORE. It's an engineering firm.

CM:   Ok, and that's spelled for the record.

LM:   Q-O-R-E.

CM:   Ok.

LM:   Weird name.

CM:   Is that located...where?

LM:   I work out of the Huntsville office.

CM:   Ok.

LM:   They have a Decatur office also.

CM:   Alright. What do you do there?

LM:   I'm, I guess, a construction inspector,...would be the easiest term. I am an engineering technician.

CM:   Alright. Getting back to the skating rink and leading into Stephen, you could have met him at the skating rink or you would have met him at somebody's house?

LM:   Yeah we... his mom and I had a mutual friend,...

CM:   Ok.

LM:   ...Not really for sure if the first time I saw him if it was at the rink or at someone else's house or where I don't know. But, it was through his momma.

CM:   Ok, so you knew his mom first?

LM:   Yeah.

CM:   Were you dating her at the time or were you just acquaintances?

LM:   Well, I'm not sure when we went from acquaintance to dating.

CM:   Ok, where were you living at that time?

LM:   At that time I was still living at home.

CM:   Which was where?

Page 8                                                    File # 99047-001

LM:   ████ Miller Street.

CM:   ████ Miller Street?

LM:   Yeah.

CM:   Alright, and how would you describe the nature of your relationship with S████ prior to him becoming your stepson?

LM:   We got along OK ... got along better with Jerry.

CM:   Ok, that's J███ his older brother?

LM:   Yes.

CM:   Ok. When you say you got along did you visit, did you do social activities together, or did you just see him at the skating rink?

LM:   We did social activities together later on.

CM:   What type of social activities?

LM:   Skating I guess. I don't really remember.

CM:   Ok. How about like cave crawling?

LM:   Oh yeah.

CM:   Ok. How about shooting fire works in the parking lots of stores.

LM:   Yeah.

CM:   Ok. Go to movies?

LM:   Yeah, long time ago.

CM:   Go swimming?

LM:   Yeah, we used go off and on, of course the whole family would go.

CM:   Go skinny dipping?

LM:   I think, maybe, I might should talk to a lawyer.

CM:   On that question or...?

**Page 9**                                                                    File # 99047-001

LM:   No, just in general.

CM:   So you want a lawyer right now?

LM:   Yeah. I am going to try to find one. I don't know many lawyers.

CM:   Ok.

LM:   Cause it look like it going to go... I just need some advice.

CM:   Alright. That's your right and we respect it and you know you just have to do what
      you need to do on finding one I can't recommend one even if I knew one.

LM:   Yeah the only one I know is Tom Diglulian. He helped me on the guardianship for
      B██████

CM:   Alright the time... we are going to terminate the interview.

TW:   Can I say one thing before you turn that off?

CM:   Sure, yeah, absolutely.

TW:   Let me ask you a question and I just want you to think on this and I am going to give
      you some definitions. I don't want you to answer any of my questions, ok? You
      have asked for an attorney.

LM:   Ok.

TW:   When Chris was telling you about sexual deviate... you have sex... sexual deviate
      manner or whatever when he said... what in your mind does that in entail?

LM:   Sex, touching, anything.

TW:   Well a lot of people may say deviate....

LM:   It's a child....

TW:   ... they got this little deviate thing. Not necessarily as he was saying deviate sexual
      intercourse can be oral or anal. In other words by definition, state definition if I am
      performing cunnilingus, do you know that means?

LM:   Uh um.

TW:   If I am having oral sex with my wife, I am performing oral sex on my wife that
      lawfully she was not my wife they would consider that deviant. Do you understand

 File # 99047-001

what I'm saying?

LM:   Oh, ok.

TW:   So I don't want you to... a lot of people misunderstand that term and get this wild thing going through their head that they think I'm this big deviant guy. I do a lot of things that under the law if it wasn't with my wife they would consider. It's just a way to describe it.

LM:   Oh, ok.

TW:   Ok, so some of things that you know if my wife were to give me oral sex if she was not my wife that would be considered deviant or that would be considered deviant sexual intercourse, you understand what I'm saying?

LM:   Oh, ok.

TW:   So it's not necessarily a deviant act that 99.9 % of the people have not done themselves.

LM:   Oh, ok.

TW:   Ok. I want you to understand that and that later you should look it up and understand that when were talking about... I'm not talking about doing a dog or anything like that. I am talking about normal things with unmarried people. Ok. So don't let that word freak you out. If you sit around and decide that you want to talk to me or Chris and say hey look I've got some things I need to talk to you about. I have found that in like cases like this right here the chances are something very, very similar has happened maybe to you and I think we are wanting to give you an opportunity.

CM:   Yeah there's two sides to every story.

TW:   That people need to understand where you are coming from and if you decide that want to do that. I'm not telling you that you need to; I'm not telling you don't need to. But I'm telling you know as much as anybody else what happened with all of these people. Do you understand what I'm saying?

LM:   Uh-huh.

TW:   And if you want your story to be told we are here for you. Got any questions?

LM:   No, sir.

CM:   This is my card, and Sergeant White is leaving his contact information.

File # 99047-001

LM:   Ok.

CM:   I'm physically based in Madison so I don't come up from Montgomery I'm right here in this area.

LM:   Ok.

CM:   Of course, Sergeant White is as well.  After you talk with your attorney if yall want to sit down and discuss this that's fine.  If you don't, you know, we are just going to plug along with the Investigation and go ahead and follow leads were they take us.

LM:   Ok.

CM:   Nothing personal we just...

LM:   You're just doing your job and I understand that.

CM:   Anything else?

TW:   No, sir.

CM:   Ok.  I am going to terminate the interview and the time now is... we will call it twenty five minutes after nine.

LM:   Ok.

CM:   Thank you Mr. Montgomery.

### SEVENTEEN MINUTES, 56 SECONDS

CM:adf

# IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,     )
                                     )

     Petitioner,              )
                                     )

vs.                           )     CASE NO:  CC 06-988.60
                                   )

STATE OF ALABAMA,       )
                                   )

     Respondent.           )
                                   )

## ORDER

This cause is before the Court on the Petitioner's Petition for Relief from Conviction or Sentence Pursuant to Ala. R. Crim. P. 32 and State's Motion to Rule Based on Pleadings/State's Motion to Dismiss Petition (hereinafter, "Motion to Dismiss").  In responding to the State's Motion to Dismiss, the Petitioner submitted a document that in substance was a motion for the District Attorney to recuse himself from this proceeding on the grounds that he represented the Petitioner's wife during her prosecution for an offense that was related to the offense for which the Petitioner was convicted in the underlying criminal proceeding.

Accordingly, the State shall have thirty (30) days from the date of this Order within which to respond to the Petitioner's motion.  Ruling on the State's Motion to Dismiss will be held in abeyance pending the State's response to the motion to recuse.

**ORDERED** and **DONE** on this the ___ day of May, 2011.

GLENN E. THOMPSON,
CIRCUIT JUDGE

5/12/11 Copies

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,  )
                      )
    Petitioner,      )
                      )
vs.                   )    **CASE NO:  CC 06-988.60**
                      )
STATE OF ALABAMA,     )
                      )
    Respondent.      )
                      )

### ORDER

    This cause is before the Court on Petitioner's Supplemental Amendment to Rule 32 Petition for Post Conviction Relief. Upon consideration, Petitioner's motion is granted. No further amendments shall be allowed. Petitioner also has pending a motion for the District Attorney to recuse himself from participation in this proceeding. Upon consideration, Petitioner's motion is denied. Accordingly, the District Attorney shall have ninety (90) days from the date of this Order within which to file a response to the petition, as amended.

    The Clerk shall provide copies of this Order to the Petitioner and the District Attorney.

    **ORDERED** and **DONE** on this the ____ day of August, 2011.

8/3/11
copies

**GLENN E. THOMPSON,**
**CIRCUIT JUDGE**



ELECTRONICALLY FILED
12/8/2011 2:18 PM
CC-2006-000988.60
CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA
JOHN PAT ORR, CLERK

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,　　　　　)
　　　　　PETITIONER　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　　　　　)　　　Case No. CC06-988.60
　　　　　　　　　　　　　　　　　　　　)
STATE OF ALABAMA,　　　　　　　)
　　　　　RESPONDENT　　　　　　　　)

### Motion to Extend Time to Respond

Comes now the State of Alabama, by and through Charles B. Elliott, Assistant District Attorney for the Eighth Judicial Circuit, and requests additional time to respond to the instant Rule 32 petition. As grounds for said motion, the undersigned states:

1. Due to a change in staff in the district attorney's office, no response has been filed in the instant petition.

2. In order to properly respond, additional time is requested.

Wherefore, the State of Alabama respectfully requests this Honorable Court to extend the time for the State to respond by an additional forty-five days.

Submitted on this the 8th day of December, 2011.

Certificate of Service

I hereby certify that I have on the submitted date as noted above served a copy of the foregoing on the petitioner by placing the same in U.S. First Class Mail, Postage Prepaid to Lyle Dan Montgomery AIS # 263476, at **Easterling Correctional Center.**

Charles B. Elliott

_/s  Charles Elliott_
Charles B. Elliott
_Assistant District Attorney_

**IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA**

| | | |
|---|---|---|
| LYLE DAN MONTGOMERY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **CASE NO:  CC 06-988.60** |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER

This cause is before the Court on the State's Motion to Extend Time to Respond. Upon consideration, the State's motion is **GRANTED**.  Accordingly, the State shall have an additional forty-five (45) days from the date of this Order within which to file a response to the Petitioner's Rule 32 petition.

The Clerk is directed to give immediate notice to the District Attorney and Petitioner.

**ORDERED** and **DONE** on this the _12th_ day of December, 2011.

12/21/11
Copies

                                                          GLENN E. THOMPSON,
                                                          **CIRCUIT JUDGE**

**SCANNED**

John Pat Orr

Circuit Court Clerk

District Court

P.O. Box 668

Decatur, AL 35602

Lyle Dan Montgomery

CASE No: CC 06-988.60

Dear Sir,

I am writing to inquire as to the status of my Rule 32 petition in the above case, Please also Note a change in my address as to Dorm number and Bed number only,

Thank You for any consideration in this matter,

Respectfully

Lyle Montgomery

Lyle Dan Montgomery

263476    H2-10A

Easterling Correctional Facility

200 Wallace Drive

Clio, AL 36017

March 21, 2012

**FILED IN OFFICE**
John Pat Orr, Clerk

·MAR 2 6 2012



Lyle Montgomery
2039724 H2-104
200 willow Drive

Clio, AL 36017

John Paul Orr

Circuit Court Clerk

District Court

P.O. Box 669

Decatur, AL 35602

200

ELECTRONICALLY FILED
4/5/2012 2:09 PM
CC-2006-000988.60
CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA
JOHN PAT ORR, CLERK

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

| | |
|---|---|
| **LYLE DAN MONTGOMERY,** | ) |
| **PETITIONER** | ) |
| | ) |
| **VS.** | )   **Case No. CC06-988.60** |
| | ) |
| **STATE OF ALABAMA,** | ) |
| **RESPONDENT** | ) |

### Motion to Extend Time to Respond

Comes now the State of Alabama, by and through Garrick L. Vickery, Assistant District Attorney for the Eighth Judicial Circuit, and requests additional time to respond to the instant Rule 32 petition. As grounds for said motion, the undersigned states:

1. The Petitioner in this cause has alleged ineffective assistance of counsel.

2. In order to properly respond to this allegation, the undersigned requests an extension of time to file any response so that it will include an affidavit from the Petitioner's defense attorney, Tom DiGiulian.

Wherefore, the State of Alabama respectfully requests this Honorable Court to extend the time for the State to respond for an additional fourteen days.

Submitted on this the 5th day of April, 2012.

---

**Certificate of Service**

I hereby certify that I have on the submitted date as noted above served a copy of the foregoing on the petitioner by placing the same in U.S. First Class Mail, Postage Prepaid to Lyle Dan Montgomery, AIS # 263476, at **Easterling Correctional Facility.**

s/ Garrick L. Vickery
Garrick L. Vickery

---

s/ Garrick L. Vickery
Garrick L. Vickery
Assistant District Attorney

IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

| | | |
|---|---|---|
| LYLE DAN MONTGOMERY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CASE NO: CC 06-988.60 |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER

This cause is before the Court on the State's Motion to Extend Time to Respond. Upon consideration, the State's motion is **GRANTED**. Accordingly, the State shall have an additional fourteen (14) days from the date of this Order within which to file a response to the Petitioner's Rule 32 petition.

The Clerk is directed to give immediate notice to the District Attorney and Petitioner.

**ORDERED** and **DONE** on this the 15th day of April, 2012.

**GLENN E. THOMPSON,**
**CIRCUIT JUDGE**

4/17/12
Copies

**SCANNED**

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,
   Petitioner,

vs.                              CASE NO: CC 06-988.60

STATE OF ALABAMA,
   Respondent.

### ORDER

The Court is in receipt of correspondence from the Petitioner inquiring into the status of the above-styled case. The Petitioner requests information about any activity that has occurred in his case since May 21, 2012. The Court has reviewed the case file and hereby informs him that an Order granting the State additional time to respond to his post-conviction petition was issued on April 13, 2012, a copy of which is attached hereto.

The Clerk shall provide copies of this Order to the Petitioner and the District Attorney.

**DONE** this 21 day of June, 2011.

GLENN E. THOMPSON,
**CIRCUIT JUDGE**

**SCANNED**
6-21-12
Copy to Petitioner - 6-21-12 CRP

IN THE CIRCUIT COURT OF MORGAN COUNTY ALABAMA

Lyle Dan Montgomery

V

CC-06-988.60

State of Alabama

Motion To Mandate Ruling

Comes Now the petitioner Lyle Don Montgomery by and through himself (Pro Se) and moves this Honorable Court to rule on his pending A.R.Cr.P. Rule 32 Post Conviction Petition, and amendments to the petition, and shows as grounds the following;

(1) The original petition was filed Nov. 18th 2010.

(2) Petitioner filed amendment to petition July 25th, 2011

(3) Court accepts amendment to petition and grants the State 90 days to reply on Aug 15th 2011.

(4) Court grants State an additional 45 days to reply Dec. 12, 2011.

(5) State again fails to reply, so petitioner requests case status from Circuit Court clerk March 21, 2012.

(6) State requests extension of time to reply April 5th 2012.

(7) Court grants State an additional 2 week extension April 15th 2012.

(8) Petitioner receives notification of the Courts granting State an additional 2 weeks on June 21 2012, well after the 2 week deadline had passed.

(9) On several occasions the State has requested and been granted additional time to reply after the Court ordered deadline had expired.

(10) Once again the State has failed to reply after being granted ample extensions by the Court.

(11) 90 days have passed since Court granted latest extension of an additional 2 weeks.

(12) This is a violation of Rule 32.7 (a) A.R.Cr.P.  The petitioner wishes to point out the fact he has remained patient while the state has failed to comply with the Courts orders.

(13) The petitioner wishes to bring to the Courts attention the fact he was anticipating a reply from the State explaining why they with-held exculpatory evidence that the state was required to produce in discovery, and why a mis-trial should not be declared due to prosecution alluding to this very with-held exculpatory evidence that the Court cautioned both parties not to mention unless admitted into evidence.

(14) The States failure to reply are substaintialy predjudicing the petitioner.  Rule 32.9 A.R.Cr.P. entitles the petitioner to an evidentiary hearing to determine disputed issues of material fact.  It appears the State is attempting to deny the petitioner a fair evidentiary hearing by tactics intended to delay these proceedings and causing un-due burden on the petitioner including, but not limited to, enabling and promoting lapse of memory of the petitioner and any material wittnesses, hindering the Post Conviction Discovery process the petitioner may need to utilyze, and possibly denying the petitioner relevant evidence by these un-warranted excessive delays in not only replying — but also in requesting additional extensions after failing to reply per orders of the Court.

(15) As previously stated, the petitioner has been extremely patient and the Court has extended ample opportunity for the State to reply yet they refuse to do so!
Therefore, at this time, the petitioner requests the Court to rule on petition and accept un-refuted claims as statement of true fact. Scroggins V State 827 So 2d 878 Ala Crim Appeals (2001) When the State does not respond to a Post Conviction Petitioners allegations the un-refuted statement or facts must be taken as true.

Prayer for Relief

Wherefore the petitioner prays this Honorable Court grant the relief requested, accept the un-refuted claims in Post Conviction Petition as true and either declare a mis-trial or grant petitioner a new trial sentence hearing or other relief the Court deems just.

Certificate of Service

I Lyle Dan Montgomery certify I have served a copy of the foregoing motion to mandate ruling by placing in prison mail addressed to the Morgan County Circuit Clerk and the Morgan County Distric Attorney this the 23 day of July 2012.

Lyle Dan Montgomery

Lyle Dan Montgomery
ECF Dorm H2-10A
200 Wallace Dr.
Clio Al. 36017

7/31/2012 3:38 PM
CC-2006-000988.60
CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA
JOHN PAT ORR, CLERK

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

| | |
|---|---|
| **LYLE DAN MONTGOMERY,**<br>**PETITIONER** | )<br>)<br>) |
| **VS.** | )  **Case No. CC06-988.60** |
| **STATE OF ALABAMA,**<br>**RESPONDENT** | )<br>)<br>)<br>) |

### Motion to Extend Time to Respond

Comes now the State of Alabama, by and through Garrick L. Vickery, Assistant District Attorney for the Eighth Judicial Circuit, and requests additional time to respond to the instant Rule 32 petition. As grounds for said motion, the undersigned states:

1. The Petitioner in this cause has alleged ineffective assistance of counsel.

2. In order to properly respond to this allegation, the undersigned requests an extension of time to file any response so that it will include an affidavit from the Petitioner's defense attorney, Tom DiGiulian.

3. This affidavit should be completed within the next fourteen days.

Wherefore, the State of Alabama respectfully requests this Honorable Court to extend the time for the State to respond for an additional fourteen days.

Submitted on this the 31st day of July, 2012.

Certificate of Service

I hereby certify that I have on the submitted date as noted above served a copy of the foregoing on the petitioner by placing the same in U.S. First Class Mail, Postage Prepaid to Lyle Dan Montgomery, AIS # 263476, at **Easterling Correctional Facility.**

s/ Garrick L. Vickery
Garrick L. Vickery

s/ Garrick L. Vickery
Garrick L. Vickery
Assistant District Attorney

IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,                    )
                                        )
        Petitioner,                     )
                                        )
vs.                                     )    CASE NO: CC 06-988.60
                                        )
STATE OF ALABAMA,                       )
                                        )
        Respondent.                     )
                                        )

## ORDER

        This cause is before the Court on the State's Motion to Extend Time to Respond
and the Petitioner's Motion to Mandate Ruling.  Upon consideration and for good cause
shown, the State's Motion is **GRANTED**.    Accordingly, the State shall have an
additional fourteen (14) days from the date of this Order within which to file a response
to the Petitioner's Rule 32 petition.  Furthermore, as a consequence of the State being
granted additional time to respond to the Petitioner's Rule 32 petition, the Petitioner's
Motion to Mandate Ruling is **DENIED**.

        The Clerk is directed to give immediate notice to the District Attorney and
Petitioner.

        **ORDERED** and **DONE** on this the _____ day of August, 2012.

                                        **GLENN E. THOMPSON,**
                                        **CIRCUIT JUDGE**

**SCANNED**

8/20/12 Copies

IN THE CIRCUIT COURT OF MORGAN COUNTY ALABAMA                    208

Lyle Don Montgomery
    petitioner

    v                                      Case No CC 06-988.60

State of Alabama
    Respondent


        Motion To Mandate Ruling or In The Alternative
              Set Cause For Evidentiary Hearing


    Comes Now Lyle Don Montgomery (Pro Se Petitioner) and
respectfully moves this Hon. Court to rule on his pending
Rule 32 petition and amendments to the petition, or in
the alternative, set cause for evidentiary hearing
pursuant to Rule 32.9 A.R.Cr.P. and shows as grounds
the following :

(1.) The original petition was filed 11/18/10, over 23 months ago.

(2) The petitioner amended petition July 25th 2011.

(3) State was granted 90 days to respond on Aug. 15 2011

(4) After failing to respond, State was granted additional 45 days
    to reply on Dec. 12 2011.

(5) After failing to respond, State was granted an additional 14
    days to reply April 15th 2012.

(6) Months later, the petitioner requests this Hon. Court to
    discontinue allowing the State to ignore Court orders
    and rule on his pending petition. Petitioner filed
    this motion to mandate ruling approx. the first week of
    July 2012, however the Court denied and granted the
    State an additional 14 days on Aug 7th 2012.

(7.) Two months have passed since the State was granted an additional 2 weeks to respond. The petitioner has again remained patient, yet the State still refuses to comply with the courts order.

(8) The petitioner again brings to the Courts attention the substaintial predjudice these unwarranted refusals to comply with the Courts orders are placing on him and his pending petition including, but not limited to, enabling and promoting lapse of memory of not only the petitioner, but also of material wittnesses, giving the State ample opportunity to misplace, lose, or destroy with-held exculpatory evidence that was not presented to petitioner in discovery ... not entered into evidence at trial ... but was testified to by State wittnesses and not made available to determine if it was actually what the State wittnesses claimed it was! This should have caused a mistrial! The judge cautioned all parties at opening arguement phase that such activity would cause a mistrial.

(9) This purposeful delay by the State is yet another example of prosecutorial misconduct aimed at giving the State an unfair advantage in these proceedings. It is clear the State has no intention to respond ... only a desire to delay! The Court has granted ample time extensions for what the Court calls `good cause shown' however the petitioner has not been `shown good cause' or even supplied a single copy of States requests for extension of time.

## Prayer For Relief

wherefore the petitioner prays this Hon. Court stop these unwarranted series of excessive delays, accept as true the petitioners unrefuted claims and rule on his pending petition or, in the alternative, set cause for evidentiary hearing on petitioners claims and petitioner prays for any other relief the Court deems fair and just.

## Certificate of Service

I Lyle Dan Montgomery do certify I have served a copy of the foregoing by placing in prison mail box addressed to Morgan County Circuit Clerk and Morgan County Distric Attorney office.

Done this the 7th day of Oct. 2012

Lyle Dan Montgomery 263476

ECF   Dorm H2 - 10 A

200 Wallace Dr.

Clio Ala. 36017

Lyle Dan Montgomery
  Petitioner

v                                    Case No cc 06-888.60

State of Alabama
  Respondent

        Petitioners Third Motion To Mandate Ruling

Comes Now Lyle Dan Montgomery (Pro Se Petitioner) and
requests this Honorable Court rule on his pending Rule 32 Post
Conviction Petition and amendments, and shows as follows;

(1) The Court accepted amendments to petition and gave the
    State 90 days to respond on Aug. 15th 2011.

(2) The State requested, and was granted, numerous time extensions
    including, but not limited to, 45 days to reply Dec 12th 2011,
    14 days April 15 2012, and on Aug 7th 2012 the Court
    denied petitioners motion to mandate ruling citing this was
    a consequence of the State being granted additional time
    to respond to petition and amendments

(3) In each instance the deadline to reply imposed by the Court
    had passed before the State even request additional time.
    To date the State has failed to reply!

(4) The petitioner requests this Hon. Court rule on his pending
    Rule 32 Post Conviction Petition and accept unrefuted statements
    of fact as true. Scroggins v. State 827 So 2d 878 Al. Cr App (200

"Wherefore the petitioner prays this Hon. Court grant the requested relief and rule on his pending petition, or at the very least, set this matter for evidentiary hearing and afford the petitioner the process he is due under the State of Alabama Constitution and the United States Constitutional amendments which garuntee due process.

I Lyle Dan Montgomery certify I have served a copy of foregoing motion by placing in prison mail box addressed to the Clerk of Court for Morgan County Al. & the Morgan County District Attornies office.

Done this the 6th day of May 2013

Lyle Dan Montgomery 263456
ECF Dorm H2-10 A
200 Wallace Dr.
Clio Al. 36017

5/15/2013 9:32 AM
52-CC-2006-900988.60
CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA
CHRIS PRIEST, CLERK

## IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA

LYLE DAN MONTGOMERY,       )
      **PETITIONER**       )
                          )
VS.                        )      **Case No. CC-06-988.60**
                          )
**STATE OF ALABAMA,**        )
      **RESPONDENT**       )

### STATE'S SUBMISSION OF EVIDENCE UNDER
### ALABAMA RULE OF CRIMINAL PROCEDURE 32.9

COMES NOW THE STATE OF ALABAMA, the Respondent, by and through Garrick

L. Vickery, Assistant District Attorney for the Eighth Judicial Circuit, and moves this Honorable

Court to accept the following evidentiary response as authorized by Ala. R. Crim. P. 32.9.

Included in this response is an affidavit from Petitioner's trial counsel, Tom DiGiulian.

Wherefore, the State of Alabama respectfully requests this Honorable Court to consider

the matter submitted and dismiss the petition.

Submitted on this day: May 15, 2013.

Certificate of Service

    I hereby certify that I have on
the submitted date as noted above
served a copy of the foregoing on the
petitioner by placing the same in U.S.
First Class Mail, Postage Prepaid to
**Lyle Montgomery, AIS # 263476, at
Easterling Correctional Facility.**

    s/ Garrick Vickery
    Garrick L. Vickery

      s/ Garrick Vickery
      Garrick L. Vickery
      Assistant District Attorney

ELECTRONICALLY FILED
5/15/2013 9:32 AM
52-CC-2006-000988.60
CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA
CHRIS PRIEST, CLERK

## IN THE CIRCUIT COURT FOR MORGAN COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
           VS.                       )
                                     )          CASE NO, CC 06-988
LYLE DAN MONTGOMERY,                 )
                                     )
           DEFENDANT.                )

## AFFIDAVIT OF THOMAS M. DI GIULIAN, REGARDING PETITION FOR RELIEF UNDER RULE 32 AS FILED BY LYLE DAN MONTGOMERY

## MEMO REGARDING RULE 32 PETITION

Personally appeared before m, the undersigned authority, Thomas M. Di Giulian, and after having been duly sworn, deposes and says on oath:

My name is Thomas M. Di Giulian, I am over the age of 19 years, and have personal knowledge of the matters and things set forth in this affidavit.

With regard to the pleading denominated "PETITION FOR RELIEF FROM CONVICTION OR SENTENCE PURSUANT TO RULE 32, ALABAMA RULES OF CRIMINAL PROCEDURE":

## ISSUE I

Whether or not the indictment was returned based on perjured statements, the witnesses who testified against Mr. Montgomery, specifically the victims and the witnesses who testified as to prior bad acts, all testified at trial, and under oath, that the Defendant molested them.

I filed a Motion to dismiss the indictment or for a more definite statement which Motion was overruled by the Trial Court.

## ISSUE II

1

As I recall, Mr. Montgomery told the investigators that he wanted an attorney. Questioning stopped, but one officer did continue to talk to Mr. Montgomery. Mr. Montgomery gave no further statement to the police after he advised the police that he wanted an attorney. The statement that he did give was not inculpatory.

On Page 20, of the Petition, Paragraph 16, the Defendant states that I never mentioned any violations of Miranda and never objected to the entry of statements against him. As I have stated elsewhere, our trial strategy was to put Mr. Montgomery on the witness stand. As a result, there was no reason to object to his statement on Miranda grounds, the statement was not inculpatory, and, at the point the Defendant told the officers that he wanted an attorney, they did not question him any further.

With regard to the assertion in Paragraph 17, on Page 21, I don't recall whether or not I explained to the Defendant the reason and purpose behind the Motion For Judgement of Acquittal at the close of the State's case and at the close of the entire case. It certainly would not have made any difference to trial strategy or to the outcome of the proceeding. With regard to Paragraph 18, on Page 21, of the Petition, I don't recall if Mr. Montgomery's statement was entered into evidence or not, but also, the statement was not inculpatory. As a result, there would be no reason to object to its admission.

## ISSUE III

On Page 23 and 24, of the Petition the Defendant, I believe, misquotes the Courts charge to the jury in that, at the top of Page 24, of the Petition, the Defendant sets out his recollection of a part of the Court's jury charge as to the definition of

2

reasonable doubt: "another way to say this is: I believe the Defendant is guilty because _____". The standard charge and as I recall the charge given in this case is as follows: "I believe the Defendant is not guilty because ..."

### ISSUE IV

With regard to Issue IV, which begins on Page 26, of the Petition, and particularly the section titled "Testimony Induced to Be Perjured by the Alleged Victim", the case against Blake Garrett was dismissed. ████ G████ testified and the Jury chose to believe him. It would seem to me that if one case is dismissed in front of the Jury, that would put into question the credibility of the other witnesses for the State with regard to the other charges.

At page 27, with regard to any knowledge I might of had about government documents existing that show that the case against Montgomery was a bad faith prosecution, there were no such documents and I was aware of none. The Defendant makes reference to the illicit testimony given to Special Investigator McRae. Blake Garret got on the witness stand and recanted his former statement. The other victim did not. The other victim testified as he had in his statement to the State Investigator. The case in which B███ G███ was the victim was dismissed on Motion of the Defendant. The other case went forward.

Additionally, as I recall, I was not aware that Blake would recant his statement until long after Danny was indicted.

As I recall, a Motion to dismiss the indictment was filed and was denied. With regard to failure to obtain a transcript of the Grand Jury proceedings, there usually is no

3

transcript of Grand Jury proceedings in this County.

On Page 32, the Defendant talks about the search of his residence and vehicles. The Defendant seems to be confusing the requirements of a search warrant with a voluntary consent to search. The record contains a consent to search vehicles and a consent to search a residence. Additionally, I do not recall any inculpatory evidence being obtained by the State in these searches, and I don't recall any of the evidence seized being used at trial.

We requested that the items taken in the search be returned to the Defendant and as I recall, all but the firearms were returned to him.

### REPLY TO SUPPLEMENTAL AMENDMENT TO RULE 32

I now address the Defendant's reply to the amended Rule 32.

1.)     Without reading the transcript, I don't know to what the Defendant is referring when he recites that, "I had extreme difficulty hearing the jurors, prosecution witnesses, and the Judge". While I certainly don't hear as well as I used to, I didn't have any trouble hearing exactly what went on. Many times witnesses mumble or don't speak into the microphone. On occasion I did request that a witness speak up, or repeat the answer.

I am unclear as to what the Defendant means by the prosecution making representations on behalf of witnesses, and the witnesses never stated what the prosecutor said. If he is referring to the opening and closing statements, of course misrepresentation by counsel in an opening and closing statement may occur at counsel's risk, and I am not aware of any requirement that an objection be made.

4.

Usually when an objection is made, the Court will say that it is for the jury to decide if the attorney is misrepresenting the testimony.

I do not recall Judge Thompson stating anything about either attorney making reference to items and then failing to get those items into evidence, that there would be a mistrial. I think that is a fabrication and I doubt that you will find that in the record.

2.)  I may be disorganized but I don't know how that would appear in clerk's record.

3.)  I do not recall the incident to which the Defendant is referring in Paragraph 3. It is possible that I advised him that it was not necessary to take the stand to testify on redirect, possibly because he was eviscerated on cross examination. I don't remember the Defendant wanting to get back on the stand for redirect, and I don't think he did. In all likelihood, if he wanted to get on the stand, I would have allowed him to do that even though he was beat up pretty good on cross examination.

I don't see how I could prevent the Court from recessing for the evening as the Court is empowered to conduct hearings and so forth in its discretion.

4.)  I don't remember the Defendant wanting to get back on the stand for redirect, and I don't think he did. In all likely hood if he wanted to get on the stand, I would have allowed him to do that even though he was beat up pretty good on cross examination. I did, however, file a Motion to Dismiss the Indictment or Alternatively, for a more definite statement.

I don't recall filing a written Motion for Judgement of Acquittal but I feel pretty certain that I made an oral Motion for Judgement of Acquittal at the close of the State's

5.